the knowledge of the fact that the maker would not pay the bill could be of no benefit to him. In this case there is no allegation that the indorser had knowledge of this transfer of the property to a third person, or ever accepted such transfer as security for the payment of the note.

The point is not raised by the defendant that this contract of indorsement was discharged by the long delay in which no demand was made upon the maker of the note. The note having been transferred after maturity, it became, in effect, a demand note, and I do not see why, in order to hold the indorser, the holder was not bound to present it within a reasonable time. The note was indorsed by Hyde on the 1st of June, 1894, and Hyde died on the 2d of May, 1899, nearly five years after the transfer. It may well be that within this five years the maker has become practically defunct, but certainly it does not appear that if the note had been presented for payment within a reasonable time, and Hyde had notice of that fact, he could not have taken proceedings against the corporation, stockholders, or directors, by which to some extent, at least, he could have protected himself from liability. It is, however, well settled that the exception upon which plaintiff relies is based upon a transfer of the maker's property to the indorser. Such a transfer is not alleged.

It seems to follow, therefore, that these allegations failed to bring the case within the exceptions by which a demand and notice of nonpayment is excused; and we think the judgment appealed from was right, and should be affirmed, with costs. All concur.

---

(63 App. Div. 211.)

ROBINSON v. NEW YORK & T. S. S. CO.

(Supreme Court, Appellate Division, First Department. July 9, 1901.)

1. CARRIERS—CONNECTING—LOSS BY FIRE—LIABILITIES—EXEMPTIONS—BILLS OF LADING—THROUGH BILLS.

Freight was carried by a railroad under a bill of lading providing for its delivery to the consignee or a connecting carrier at the terminus in a certain city in Texas. The bill was headed, "To be used for shipments to any part of the United States," and provided for a through rate of freight to the place of destination in Massachusetts indicated on the margin, the freight to be there delivered. *Held* not a through bill of lading, but the contract of the first carrier, which ended at its terminus, so that any exemption of such carrier from liability for loss by fire did not extend to defendant steamship company, to which it was delivered by the first carrier, and it was, therefore, liable as a common carrier for loss of the freight by fire while stored in its freight house awaiting transportation by its steamer.

2. SAME—CUSTOM.

Freight was delivered by a railroad to defendant for transportation by water under a through bill of lading providing that the freight should be subject to all customary conditions of water transportation. Agents of defendant and others testified that exemption from fire was universally inserted in bills of lading issued by defendant and others, which was supplemented by the introduction of bills of lading of defendant containing such exemptions, but did not show that such exemption attached to all goods carried by defendant or others, and that plaintiff knew of such limitations, or of a usage or custom from which

notice could be inferred. *Held*, that the evidence was insufficient to show that such custom and usage had the force of law, making it a part of the bill of lading, and therefore defendant was liable as a common carrier for a loss of the freight by fire while stored in its freight house awaiting transportation on its steamers.

Patterson, J., dissenting.

Appeal from trial term, New York county.

Action by Charles L. Robinson against the New York & Texas Steamship Company. From a judgment in favor of defendant, plaintiff appeals. Reversed.

Argued before HATCH, McLAUGHLIN, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Charles E. Hughes, for appellant.
Thomas B. Hewitt, for respondent.

HATCH, J.    The plaintiff, claiming as assignee of the Slater Woolen Company, of Webster, Mass., brought this action against the defendant, a common carrier, averring that it so negligently and carelessly conducted itself in its business as carrier that certain wool belonging to the Slater Woolen Company was destroyed by fire, and lost to that company.    It appears that the defendant, known as the "Mallory Line," has for many years run a line of steamships between New York and Galveston, Tex., and during the summer of 1896 its steamers sailed from Galveston weekly.    It had large freight sheds on the wharf at Galveston, in which the freight delivered to it by the railroads was placed until it could be loaded on the steamer. The Gulf, Colorado & Santa Fé Railway Company operated a railroad from San Angelo, Tex., to Galveston, and the Texas Central Railroad operated a road from Walnut Springs, Tex., to Morgan, a point on the line of the Gulf, Colorado & Santa Fé road.    The wool in question was destroyed by fire July 2, 1896, in a shed on the wharf used by the defendant in Galveston.    It consisted of parts of two lots, viz. one lot of 65 bales of banded wool, which was a part of a lot of 74 bales shipped from San Angelo, Tex., on the Gulf, Colorado & Santa Fé Railway; and one lot of 102 sacks of wool, which was part of a lot of 156 sacks shipped from Walnut Springs on the Texas Central Railway.    Both lots were shipped by J. R. Franklin, acting as agent for the Slater Woolen Company, and were delivered in different parcels at different times by the Gulf, Colorado & Santa Fé Railway Company to the defendant at Galveston.    At the time of such deliveries there was no steamer of defendant's line in the port of Galveston, and none arrived there or was due there until after the fire, such deliveries having taken place after the departure of defendant's regular weekly steamer.    The wool was received by the Gulf, Colorado & Santa Fé Company and the Texas Central Company, respectively, under separate bills of lading, containing different conditions and provisions.    When the Gulf, Colorado & Santa Fé Company received from the Texas Central Company the wool which was shipped from Walnut Springs, it did not execute or deliver any bill of lading therefor, and the Mallory Line, upon receipt of the two lots of wool at Galveston, receipted therefor to the

railroad delivering it, but did not issue any bill of lading. It is the theory of the plaintiff that the defendant is liable as a carrier for the loss of the wool burned, and not as a warehouseman; that the bill of lading issued by the Gulf, Colorado & Santa Fé Railway Company was not a through bill, but a contract to carry to Galveston only, and that the defendant was not entitled to the benefit of any exemption therein contained; and that the Texas Central bill did not exempt the defendant from liability for loss by fire. On the other hand, the defendant claims that each of these bills of lading was a "through bill," and covered the wool from the time of its shipment down to and including the time of its destruction by fire; that no recovery could be had against it except under the terms of the bills of lading, and that under those bills the defendant was not liable for loss by fire occurring on the wharf without negligence on its part. The trial court held and decided in favor of the defendant upon these questions, and judgment was entered dismissing the complaint of the plaintiff, from which this appeal is taken.

It is not claimed that the defendant was guilty of any negligence in respect to the fire, as it was shown that the fire did not originate on property under its control. The rights and liabilities of the respective parties are to be determined upon a construction of the respective bills of lading. If that issued by the Gulf, Colorado & Santa Fé Railway Company at San Angelo is to be construed as a through bill, then it is clear that the exemption from liability contained therein for loss happening by fire inures to the benefit of the defendant, and exempts it from liability for such loss. As to the bill of lading issued at Walnut Springs by the Texas Central Railroad Company, it is conceded to be a through bill, and the defendant is entitled to such exemption from liability for loss by fire as is expressed therein. The questions presented, therefore, are quite dissimilar, and are governed by different considerations. Making disposition of the questions in the order presented, we find that the first bill, so far as its specific terms are concerned, was a contract for the carriage of the wool from San Angelo to Galveston, and there to be delivered to the consignee or a connecting common carrier. These contracts are to be construed most rigidly against the carrier. Exemptions from liability will not be presumed, but must be found clearly expressed in the contract, and, if there be any ambiguity, it will be resolved against the carrier (Edsall v. Transportation Co., 50 N. Y. 661); and the burden of proving such exemption is upon the carrier (Jennings v. Railway Co., 127 N. Y. 438, 28 N. E. 394). It is clear that within the terms of the body of the bill the contract of carriage of the first contracting railroad company terminated with the delivery of the goods to the defendant at Galveston, and by such delivery it discharged fully the obligation which rested upon it. No language is found therein which stipulates for any exemptions in favor of the defendant, or of any which inured to the benefit of the defendant company, and no exemption from liability as to it was, in terms, expressed therein. Resting the case here, it is clear that the defendant would not be exempted from liability, though it may have been in the contemplation of

the shipper, or of the consignee, or both that the wool should be further transported. Under such circumstances the first carrier occupies the relation of a mere forwarder of the goods from the terminus of its carriage. Such relation, however, does not have the effect of making its stipulation for exemption inure to the benefit of the connecting carrier, nor could it, for any purpose, bind the shipper or the owner of the goods. This was clearly decided in Babcock v. Railway Co., 49 N. Y. 491, and in Railroad Co. v. Forsyth, 61 Pa. 81. Both cases have been uniformly cited with approval by the courts of this and other states. The learned trial court, however, laid hold of various matters which appeared upon the face of the bill, from which it deduced the conclusion that it was the intent of the original parties to contract for through shipment of the wool to the place of destination. The matters thus deemed sufficient are: (1) That the bill was headed "To be used for shipments to any part of the United States, Canada, or Mexico," and a through rate of freight was agreed upon and guarantied to Webster, Mass. (2) That there appeared in writing upon the margin of the bill the letter "S" in a circle, followed by the words "Webster, Mass." (3) That by writing on the bill it appears that the goods were consigned to "Order San Angelo National Bank, at Webster, Mass." (This was the bank which had made advances upon the wool.) (4) At the bottom of the bill, and just preceding the signature of the station master, appeared the words, "Notify Slater Woolen Co., Webster, Mass.," and in the margin, "The Mallory Line." It further appears that a draft was attached to the bill of lading, and forwarded to New York, where it arrived and the draft was paid before the wool was destroyed. It is clearly apparent from all of these matters, and from the bill of lading itself, that the wool was in fact ultimately destined for Webster, Mass., and that it was to be delivered at that point to the consignee. Every shipment of goods from one state to another, and from points long distances apart, almost of necessity pass over the lines, either of rail or water, of many separate and distinct carriers. But it has never been supposed that such fact characterizes the bill of lading as a through bill, or that appropriate marks indicating the ultimate destination of the goods determine the liability of a common carrier. If there be no contract, and it receive the goods, it is bound, at its peril, to deliver them; and, if it does not, liability attaches; and, if there be any exemption, it must be found in the contract of carriage. The particular destination of the goods, therefore, is not the basis upon which the liability of the carrier, or the exemption therefrom, is to be determined. And the fact that the shipper bills the goods to such a point of destination as will necessarily carry them over the lines of successive common carriers has little, if any, bearing upon the subject of a connecting common carrier's liability. Liability is made to depend, not upon the distance that the goods are to be carried, or the number of the carriers, but upon the terms of the contract; and if, by its terms, the contract of the carrier covers all the lines between the point of shipment and the destination of the goods, then the initial carrier becomes liable for the faithful performance

of duty by all the carriers, and each one is entitled to such exemption as is contained in the contract of carriage. Jennings v. Railway Co., supra. But where the first carrier only contracts to carry to and deliver to another carrier, such connecting carrier is not entitled to any exemptions by virtue of that contract of carriage; and the fact that it was known at the time of shipment that the goods would go over different lines does not change the liability of the carrier, unless it stipulate therefor. Insurance Co. v. Wheeler, 49 N. Y. 616. In that case there was found present every element relied upon by the learned trial court to characterize this bill as a through bill of lading, except that it did not have the heading which appears upon the present bill. But in other respects the case is stronger, for therein the respective carriers contracted for a division of the freight rate, the through rate was agreed upon, and the goods were delivered by the first carrier at a warehouse common to both carriers. The contract, however, of the first carrier, as in the present case, ended at the terminus of its line; and while the goods were marked for shipment beyond this point, and the bill of lading issued by the first carrier had marginal notes showing the ultimate destination of the goods, yet it was held that stipulations exempting the first carrier from liability did not inure to the benefit of the second carrier, for the reason that its contract to carry terminated where the second carrier's begun. So in this case the contract of carriage is clear and unambiguous. It was written into the bill of lading. It was a contract to transport from San Angelo to Galveston, and no further; there to deliver the wool, either to the consignee or to a connecting common carrier. It did that, and that contract was at an end. The mere fact that it was then known that this defendant would take up the carriage of the wool at that point neither adds to nor takes away from the obligation of the first carrier under its contract. There was, therefore, nothing in this bill of lading which contained any exemption, or contract for any, which could inure to the benefit of the defendant. When it received the goods, and receipted therefor, it did so as a common carrier, and its liability attached as such eo instanti, and this relation was not changed by the fact that the wool was required to be stored pending the arrival of the defendant's steamer. London & L. F. Ins. Co. v. Rome, W. & O. R. Co., 144 N. Y. 200, 39 N. E. 79. For the loss of the wool thus received the defendant is clearly liable.

This disposes of the question presented by the San Angelo bill of lading. As we have before observed, it is conceded that the bill of lading issued by the Texas Central Railroad Company is a through bill, in consequence of which the defendant is entitled to be protected by any exemption from liability within its terms. There is, however, in this bill of lading, no express exemption, in terms, from loss sustained by fire. The defendant claims exemption, however, by virtue of the following clause in the bill:

"It is further stipulated that, in the event of the articles herein named being conveyed by water transportation en route to destination, they shall be subject to all customary conditions of same."

The defendant claims that there is a well-established usage. and custom, and generally known, that in contracts for the transportation of goods by it exemptions are always inserted covering losses sustained by fire, and therefore that this bill of lading is to be construed as though it contained, in terms, such exemption. It is a well-settled rule of law that the general course of business in the transportation of property by a common carrier, when it appears to have been generally established, may be shown, and will govern in the construction of a general engagement for shipment of property, where the proposal of the contracting party makes no reference to the exemptions and limitations of the carrier. Under such circumstances the shipper is to be regarded as contemplating such usage when the proposal is made for the contract of carriage, and the carrier will be protected by limitations and exemptions contained in a bill of lading issued in pursuance of such contract. Donovan v. Oil Co., 155 N. Y. 112, 49 N. E. 678; Robertson v. Steamship Co., 139 N. Y. 416, 34 N. E. 1053; Hostetter v. Park, 137 U. S. 30, 11 Sup. Ct. 1, 34 L. Ed. 568. In making application of this rule of law, however, it is to be borne in mind that the carrier's contract is to be strictly construed; for, as we have already seen, it is an innovation upon the common-law liability of carriers; and while, undoubtedly, it must also be construed fairly, and enforced according to the intention of the parties, yet nothing which has the effect of relieving the carrier from liability is to be taken by way of presumption or intendment. In order that custom and usage may be operative in the interpretation of a general or ambiguous clause, it must be shown to be reasonable, uniform, well settled, not in opposition to fixed rules of law, and not in contradiction of the express terms of the contract, and of such a character as will be deemed to have entered into the contemplation of the parties. As said by Judge Folger in Wells v. Bailey, 49 N. Y. 464, 471, 10 Am. Rep. 407:

"For, strictly speaking, custom is that length of usage which has become law. It is a usage which has acquired the force of law (Bouv. Law Dict., voce 'Custom'; Hursh v. North, 40 Pa. 241), and ignorance of the law will not excuse. A general custom is the common law itself, or a part of it."

Such custom must be shown to have been known to the parties when the contract was made, and to have been so generally known as to raise a presumption that the parties had it in mind at the time of the execution of the contract. Rickerson v. Insurance Co., 149 N. Y. 307, 43 N. E. 856. In the Donovan Case, supra, usage and custom was made to apply for the reason that the proposal for shipment was silent with respect to any limitations or exemptions, while by the course of business shown to have been known to the parties such stipulations were uniformly inserted in the contract. They were in fact so inserted in the contract issued by the defendant in that case. There was at no time any dispute as to the nature of the exemptions, or to what they applied, and the court therein held that, such stipulations being well known, the original proposal must be deemed to have been made and accepted in contemplation of such uniform usage. In the Robertson Case, supra, the custom

and usage shown to exist related to a shipment by water, where, in fact, for a part of the distance, the goods were carried by land, and in uniform course there had never been any deviation by the carriers from such a method. Therein the defendant was sought to be charged with liability for a deviation from the route of shipment, and the court very properly held that there was no deviation, that no goods had ever been carried entirely by water over this route, and that the parties must be held to have contracted for such method of transportation. It is at once apparent that this case differs radically from the cases cited, or, indeed, from any to which our attention has been directed. The rights and liabilities of these parties are to be determined from a construction of the language which they have used in the contract, and not from any conditions which existed prior to its execution, except so far as usage and custom may tend to aid in the interpretation of its terms. The language itself is quite general in character, and extremely uncertain in meaning. It enabled counsel for the appellant to address the court in serious argument for its entire rejection upon the ground that it was void for uncertainty. Assuming, however, that effect may be given to it, it is clearly evident that proof establishing usage and custom to incorporate an exemption from liability for fire upon the part of the carrier must be clear, cogent, and convincing. Such is the rule required by the carrier's engagement. The defendant sought to establish such custom and usage by calling agents of the steamship company and others, who in form testified that exemption from fire was universally inserted in bills of lading issued by the defendant and other water carriers, and this was supplemented by the introduction of a large number of such bills of lading, containing such exemptions. An examination of the proof, however, shows that the statement that the custom was universal was unsupported by any facts, except as it was based upon the bills of lading introduced for the purpose. We think this testimony entirely insufficient to establish a customary condition for exemption from loss by fire as entering into the defendant's contracts for carriage. At the most it showed that the defendant issued bills of lading containing clauses of special limitation, but it showed no more. None of the witnesses testified that the defendant did not carry goods upon every steamer which sailed, to which no exemption from liability as a common carrier was attached. For aught that appears, the bulk of the property carried by the defendant had attached to it no exemption from liability whatever, and the case is destitute of any proof tending to show that the shipper or persons generally contracting for shipment with the defendant had knowledge of such limitations, or knowledge of any usage or custom of which notice would be presumed. As to the innumerable water carriers, some proof was given tending to establish that they, or some of them, issued like bills of lading containing special exemptions from liability. But even these, as well as the defendant's, were not uniform in character. They each and all contained varying stipulations for special exemptions, but they were not uniform in character, and it could not be said therefrom that a uniform rule as to this or any other custom was established as a uni-

versal rule of usage. But, taking the whole of the proof, it falls short of establishing such custom and usage for the exemption here claimed as to warrant the conclusion that it had the force of law, and so embraced within the language used in this bill of lading. Indeed, to hold that the strict liability of a common carrier can be impaired and cut down by such proof is to extend the doctrine of construction limiting such liability beyond any adjudicated case to which our attention has been called. Common carriers have it at all times within their power to stipulate for such limitations of liability as the law permits. The shipper, in ordinary course, is required to accept as a condition of shipment the contracts which are presented by the carrier for him to execute. It is common knowledge that these bills of lading are made up very largely of exemptions of the carrier from liability. It is not a harsh rule, therefore, which holds the carrier to a strict construction of the contract which it makes. If it seeks exemption, it must express it in terms which the shipper can understand, and, failing in this, it may not ask the courts to resolve doubtful and uncertain words into a construction which exempts from liability, when the policy of the law requires a rigid accountability which the carrier itself has ordinarily the power to limit if it chooses.

It follows from these views that the judgment should be reversed, and a new trial granted, with costs to the appellant to abide the event.

INGRAHAM, McLAUGHLIN, and LAUGHLIN, JJ., concur.

PATTERSON, J. I concur as to the bill of lading first considered in this opinion, but I dissent as to the views expressed therein concerning the second or through bill.