**KURLAN et al. v. TIRRELL BROS. SILK CORP.**

United States District Court,
S. D. New York.
Feb. 19, 1952.

Bondy & Schloss, New York City (Norman P. S. Schloss and David E. Nierenberg, New York City, of counsel), for plaintiffs.

John J. Cunneen, New York City (Robert B. Meyner, Phillipsburg, N. J., and William J. O'Donnell, New York City, of counsel), for defendant.

IRVING R. KAUFMAN, District Judge.

Having been consolidated, these two causes came on for trial without a jury. During trial, Civil 50–324 and defendant's counterclaim in Civil 50–325 were discontinued by consent. It remains for the Court to dispose of the three causes of action in Civil 50–325.

As a result of conversations and an exchange of correspondence, defendant and plaintiffs arrived at an agreement in May, 1948. That agreement is the basis for the third cause of action, which arose earlier than the first two causes in suit. Under its terms, defendant was to weave various quantities of two different types of textiles "old 360"[1] and "2 x 1" for plaintiffs. Plaintiffs were to supply raw materials and specifications. The old 360 and 2 x 1 called for in the agreement were basically lastex-type fabrics which were sold by plaintiffs to manufacturers of bathing suits and ladies' undergarments. They differed in the construction of their warps and woofs. Apparently defendant and plaintiffs had in-

dependent experience in both the weaving and marketing of such fabrics and, in any event, they had dealt with each other on past occasions in arrangements such as this.

It appears that on orders such as that embraced in the May, 1948 agreement, it was the usual procedure for defendant to weave the fabric from yarns supplied it by plaintiffs, and, after they were fabricated, to send them on in the greige to plaintiffs' dyer where they would be held for varying periods of time until the dyer received instructions from plaintiffs.

Plaintiffs claim damages on 5,491 defective yards of old 360 and 5,452 yards of defective 2 x 1 produced by defendant under the 1948 agreement. They say that the faulty goods were woven in so defective a manner that they could be sold only as seconds, the flaws having made them completely unmarketable as first quality goods. Some of the alleged flaws were such that they apparently could not be detected until the greige goods were dyed. Although it does appear that certain flaws could have been detected while the goods were still in the greige, it was not practicable, indeed it was unwise, to examine this elastic-type cloth once it was rolled and awaiting dyeing, for additional rolling and unrolling were apt to have damaged the goods further.

Although not important to the ultimate conclusion reached, an issue exists as to whether the parties understood that weaving defects would not and could not be ascertained until the merchandise was dyed. The evidence convinces me that the parties accepted the trade practice of examining cloth of this kind after it was dyed. "It is well settled that parties who contract on a subject-matter concerning which known usages prevail incorporate such usages by implication into their agreements, if nothing is said to the contrary." Blatchford, J.; in Hostetter v. Park, 137 U.S. 30, 40, 11 S.Ct. 1, 4, 34 L.Ed. 568. See also Dixon, Irmaos & Cia. Ltda. v. Chase National Bank, 2 Cir., 1944, 144

[1]. The designation "old" is adopted to distinguish between the 360 provided for under the May, 1948 agreement and the "new" produced under the February, 1949 agreement discussed below. "Old" and "new" are merely convenient chronological distinctions and have nothing to do with the quality of the merchandise.

F.2d 759.[2] "When a usage * * * has become uniform in an actively commercial community, that should be warrant enough for supposing that it answers the needs of those who are dealing upon the faith of it. I cannot see why judges should not hold men to understandings which are the tacit presupposition on which they deal." L. Hand, J. in Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, D.C.S.D.N.Y., 1924, 299 F. 991, 994. Apart from this, the conduct of the parties in the instant case indicates that they adopted the practice of examining after dyeing.

Once at the dyer's, the rolls of greige goods were placed in a storeroom until dyeing orders were received from the plaintiffs.[3] A great number of the defects alleged here did not appear until the greige goods were dyed, and it is clear that those defects did in fact then become obvious to the naked eye.

This cause is essentially founded on plaintiffs' contention that defendant promised to weave commercially saleable first quality goods for them and that in failing to do so, defendant breached a warranty of quality. I am persuaded that under the terms of the May, 1948 agreement,[4] defendant expressly warranted that from the raw materials furnished it by plaintiffs, it would weave first quality goods. For the purposes of this agreement those terms may be equated. Neither plaintiffs nor defendant expected that the goods would be categorically flawless. First quality goods and commercially perfect goods, for instant purposes, were not terms which described the ultimate in lastex perfection. Those terms did not mean 100% perfect. That is clear from the evidence. The terms did, however, describe a high-grade material which, although not without some flaws, was so nearly impeccable that men conversant with the products of the trade would agree to its qualitative classification as firsts. The parties, I am convinced, understood that. Furthermore, it seems clear from the testimony that such imperfections as might appear in first quality goods were so much fewer in number per yard than those in seconds that the difference between the qualities was sharp and unambiguous. Defendant's position that it was to weave only "run of the mill" cloth is not borne out by the evidence. Indeed everything from correspondence to the nature of plaintiffs' business indicates that they had no use for any but commercially perfect or first quality goods, and that defendant knew this well.

An express warranty of quality having been given, defendant went ahead and wove the goods knowing that plaintiffs planned to dye and then sell them to the trade as first quality lastex. Defendant, I find, also knew that the disclosure of most weaving defects would have to wait upon the dyeing of the greige goods.

In the autumn of 1948 difficulties began to arise between the parties over the quality of some of the goods being dyed,[5] and plain-

---

2. Williston on Contracts (rev. ed.) § 649 sets out an interesting and germane discussion of the distinction between usage and custom. "Usage is a fact and not opinion or rule of law. It may be defined as habitual or customary practice among a certain class of people, or in a trade * * *. Custom is such a usage as has by long and uniform practice become the law of the matter to which it relates." The instant matter does not rise to the authority of a rule of law. It is, however, clearly usage.

3. Even if they had wanted it, plaintiffs did not have access to the storeroom, for in there were also goods of their competitors, and the dyer, as a matter of business policy, did not permit his customers to enter personally. It is also clear from the testimony that the dyer was not charged with any duty to inspect the goods prior to his processing them. He merely dyed the goods, and if defects appeared after dyeing, he would, and in fact did, notify plaintiffs accordingly.

4. Oral and written word form the basis of this agreement. Charles Kurlan told Philip Tirrell in May 1948 he would award weaving contracts but would have to have commercially perfect goods. Plaintiffs' Exhibits 1 and 2 specify the quantity and type to be woven and price to be paid.

5. Between June, 1948 and November, 1948, plaintiffs apparently did not complain to defendant about the quality of the cloth. The time lag is explained by the fact that sometimes greige goods are stored

tiffs began complaining to defendant by letter, telephone and in face-to-face conversations. The complaints were based on occasional reports plaintiffs received from their dyer to the effect that the dyeing was bringing out weaving flaws not apparent to the eye while the goods were in the greige.

■ Then ensued a period in which plaintiffs and defendant attempted settlement of their difficulties. In February and March, 1949 defendant credited plaintiffs' account with $2000 for specifically defective or second quality goods. Defendant's position is that the credit was in full and final settlement of all claims plaintiffs had against it for defective 2 x 1 up to March 5, 1949. Plaintiffs admit the credit of $2,000 and likewise say that it was an adjustment covering only 2 x 1 goods. However, whereas defendant urges that *all* defective 2 x 1 goods were covered in the credit, plaintiffs urge that 5,452 yards of some 13,000 yards of defective 2 x 1 were not so covered, and it is on those 5,452 yards of defective 2 x 1 that plaintiffs base part of their third cause of action. I find that in fact there was no accord and satisfaction as to the 5,452 yards of 2 x 1 on which damages are claimed. Furthermore, plaintiffs urge that, upon defendant's admission, there was no accord and satisfaction as to 5,491 yards of allegedly defective old 360 produced under the 1948 agreement. Thus damages on this yardage are also sought in the third cause of action.

Philip Tirrell, president and general manager of defendant company, agreed in his testimony that no settlement was ever made on 360 cloth. The defense of accord and satisfaction therefore, by defendant's own admission and in spite of its amended answer, is hollow so far as it concerns old 360 under this agreement or new 360 under the February, 1949 agreement to which I shall turn in a moment.

The facts underpinning the first and second causes of action began early in February, 1949. Plaintiffs contend that they

and defendant formulated an agreement, partially oral, partially written, calling for the manufacture by defendant of 18,000 yards of first quality new 360. It is defendant's position that the agreement, as it was finally formulated, obligated defendant to produce new 360 of a "run of the mill" quality. As I interpret defendant's contention, it is that it was not obliged to turn out commercially perfect or first quality goods. Defendant's claim in this respect rests on two letters exchanged between it and plaintiffs. On February 2, 1949 plaintiffs wrote defendant an order for weaving 18,000 yards of new 360. The third paragraph of plaintiffs' letter stated: "You are going ahead weaving pick and pick for me assuring me that in weaving pick and pick the troubles we have had will be eliminated."

Defendant answered in its letter of February 5, 1949: "However, we are not guaranteeing quality to the extent mentioned in the third paragraph of the above mentioned communication."

There followed a conversation in which defendant Philip Tirrell said that all that was intended was that he would not weave 100% perfect merchandise. In that conversation, plaintiff, Charles Kurlan, agreed that he did not expect absolutely flawless textiles but that he did expect commercially perfect goods from defendant's looms.

This evidence was admitted, as was similar evidence on the third cause of action, because it completed the written portion of the agreement and, most important, it helped resolve an apparent ambiguity therein. It neither varied nor contradicted the terms expressed in the exchange of letters. In short, it did not violate the parol evidence rule. Laskey v. Rubel Corp., 1951, 303 N.Y. 69, 100 N.E.2d 140. Williston on Contracts, § 636, states: "The parol evidence rule assumes agreement upon the writing in question as a complete statement of the bargain, that is, as an integration. If the parties never adopted

for rather long intervals with the dyer before he receives processing instructions. A witness in the dyeing business testified that he has kept goods in storage as long as ten months. He further

testified that long periods of storage have no harmful effect upon the quality of the material if it is properly stored, which was the case here.

the writing as a statement of the whole agreement, the rule does not exclude parol evidence of additional promises."

 It is most clear that the parties never adopted the letters as a statement of the whole agreement, for indeed the ambiguity inherent in the exchange of letters made it *seem* as though defendant was modifying plaintiffs' proposal. In the circumstances, I find that it called for clarification. The parties, I believe, were saying essentially the same thing but in different ways. Plaintiffs were proposing that defendant eliminate the serious weaving defects which had appeared in the lastex woven under the May, 1948 agreement. They were not calling for, nor did they expect, absolutely perfect goods. Defendant understandably wanted to protect itself by qualifying what it thought was plaintiffs' proposal that it weave completely flawless goods. The apparent ambiguity thus was that defendant thought plaintiffs were asking for something more than in fact they were. The conversation dispelled the ambiguity. The parol evidence "* * * rule does not exclude evidence to interpret, explain, or clarify (rather than contradict) the written document." Clark, J. in Rotberg v. Dodwell & Co., 2 Cir., 1945, 152 F.2d 100, 101. The evidence clarified, it did not contradict.

Under the terms of this agreement, as in the agreement of June, 1948, defendant expressly warranted that it would weave first quality goods for plaintiffs.

A recapitulation of my earlier discussion of the nature of first quality lastex would neither emphasize nor add anew to the warranty under the February, 1949 agreement. Suffice it to say that the warranty was there. The background of plaintiffs' complaints to defendant over seconds prior to the February agreement sharpened the weaving obligation defendant assumed in February.

█ Subsequent events were more or less a revival of the difficulties encountered between the parties under the June, 1948 agreement. The dyer again began to report flawed fabrics, and plaintiffs made frequent complaints to defendant to obviate the flaws. Plaintiffs ordered defendant to stop weaving on or about April 1st, 1949. By that time defendant had woven and delivered 12,468 yards of new 360 of which 6,899 yards were defective. The facts justified the cease weaving order.

Defendant relies heavily upon its contention that the understanding of the parties (Philip Tirrell stated this was expressed) was that the work was to be "run of the mill", or, as defendant states, to be taken "as is". I cannot accept this version, for the conduct of the parties was completely inconsistent with this. The testimony of Charles Kurlan is replete with complaints to defendant concerning the quality of the goods. Indeed, the correspondence between the parties amply bears this out.[6] If the understanding of the parties was for "run of the mill" merchandise, it is not reasonable under the circumstances of this case to believe that Charles Kurlan would thereafter repeatedly send defendant letters complaining of the quality, letters to which there were few replies from defendant and none of the replies denying that plaintiffs were entitled to reimbursement for seconds. Yet I do find

6. A reading of the following Exhibits of plaintiffs clearly indicates that plaintiffs were expecting defendant to turn out first quality goods and that defendant never asserted in a single writing that it was not under such obligation or that its obligation was merely to weave "run of the mill" quality. Exhibit 7—Plaintiffs deducted $108.94 for 2 pieces which were seconds. Exhibit 8—Defendant agrees to this allowance. (Is this the conduct of one whose only obligation is to weave "run of the mill" merchandise? If "run of the mill" is the obligation, then why make allowance for seconds?). Exhibit 9—Complaints concerning imperfections in weaving, and indications that plaintiffs were seeking first quality goods. See also Exhibits 15, 18, 18–A, 19, 19–A, 21, 24, 30, 35, 36, 37, 38, 45. Exhibit 43—Indicates quite clearly Tirrell's knowledge that he was making the allowance of $1000. because second quality merchandise had been woven and that he had previously made a similar allowance of $1000.

that Kurlan's purpose was honest and that his complaints were valid.

Exhibits 20 and 22 spell out most clearly plaintiffs' understanding of their arrangement with defendant. Exhibit 20, a letter from Charles Kurlan to Philip Tirrell, written on January 10, 1949 states: "Please remember we pay you for weaving first quality goods and give you first quality yarns and you are responsible for bad weaving * * *." Plaintiff's Exhibit 22 sent by Kurlan to Tirrell on January 14, 1949 urges defendant to settle directly with Atlas (plaintiffs' customer) for bad weaving and states: "You know selling woven goods yourself, customers are really not looking for allowances but want commercially perfect goods and not seconds and be charged first quality prices and have all the trouble as they are having with us." Further, "All I want is first quality weaving which I am not getting * * *". Also, " * * * I am only interested in getting first quality weaving and thereby avoid claims." Is it reasonable to suppose that Tirrell, having received these complaints over a period of months, would not have replied to these last two letters and have stated that he was under no obligation whatsoever if the goods were not first quality because he was simply required to turn out "run of the mill" quality? Instead, adjustments of $2,000 were made on two subsequent occasions to compensate for second quality merchandise which defendant turned out. The fact is that the previous dealings defendant had with plaintiffs made it eminently clear that plaintiffs served their trade with first quality goods and that seconds were little more than a business headache for plaintiffs. Defendant knew this throughout the entire period in question.

I have previously discussed Exhibits 27 and 28, the letters of February 2nd and 5th. Much reliance is placed on defendant's letter of February 5th (Exhibit 28) to buttress its position that "run of the mill" was its obligation. I draw the contrary conclusion from this letter, for instead of saying that it was not guaranteeing any of the merchandise, Tirrell merely stated:

" * * * we are not guaranteeing quality to the extent mentioned in the third paragraph * * *" (Referring to plaintiffs' letter of February 2nd). Plaintiff Charles Kurlan explained this obvious ambiguity by stating that in a subsequent call to Philip Tirrell, Tirrell expressed himself as unwilling to guarantee the goods as 100% perfect, and Kurlan had never asked that they be so. This was the "extent" referred to in Plaintiffs' Exhibit 28. The letter indicated quite clearly that instead of there being no guarantee there was indeed a guarantee to a certain "extent", and I find this "extent" to be first quality goods.

I have set out in detail in my findings the precise extent of plaintiffs' damages in this cause of action as well as in the other two.

■ Damages for breach of warranty of quality are measured by the difference between the value of the goods at the time of delivery and the value they would have had if they had answered to the warranty. Williston on Contracts, (rev. ed.) § 1391; 2 Sedgwick on Damages, 762; Hooper v. Story, 155 N.Y. 171, 49 N.E. 773; Clark v. Schmidt, 210 N.Y. 211, 104 N.E. 613; Fuerst Bros. & Co. v. Polasky, 2 Cir., 1918, 249 F. 447; Seligson v. Weiss, App.Div. 1st Dept.1928, 222 App.Div. 634, 227 N.Y.S. 338. The same rule is set out also in the Uniform Sales Act, e. g., New York Personal Property Law, McKinney's Consol. Laws, c. 41, § 150, subd. 7. See also Ritter v. Ehrlich, 2 Cir., 1945, 152 F.2d 181 and Armstrong Rubber v. Griffith, 2 Cir., 1930, 43 F.2d 689.

The dates of deliveries in the instant case have been agreed upon for the purpose of fixing market values, hence no dispute exists on this score.

It has been established to my satisfaction that throughout the entire period involved in this case, there were established market values for the firsts and seconds of the kind of lastex here involved. As I have found them, I have applied the values in measuring damages. The parties plead no special circumstances and, indeed, they agree that the measure of damages to be applied in the first and third causes of

976

action should be that suggested above.[7] The disagreement in the case does not seem to turn on the rule of damages to be applied, but on the issue as to whether there should be any recovery. This opinion and the findings in this case are dispositive of that disagreement and are also bottomed on the stated measure of damages in a breach of warranty of quality. Plaintiffs' version of the market values and that of defendant's expert witness Adamson are in virtually complete agreement. After observing defendant's other expert witness Gluck, I find it difficult to attach any weight to his testimony. I accept the testimony of Charles Kurlan on the market values.

■ The second cause of action is based on the problem of replacement, and the question here is whether plaintiffs' judgment was sound under the circumstances. Under the February agreement, defendant was to weave 18,000 yards of new 360. At the cease-weaving order, 5,532 yards remained to be woven. Plaintiffs reasonably had them woven at another mill for an additional, and unavoidable, 10 cents per yard. That mill wove 8,436 [8] yards of cloth for plaintiffs. Plaintiffs are seeking replacement damages on all 8,436 yards rather than the 5,532 yards which constituted the unwoven portion of the February agreement. Damages will be limited to those incurred on 5,532 yards.

Accordingly, let judgment be entered consistent with this opinion, findings of fact and conclusions of law.

7. In certain instances plaintiffs have requested the Court to apply a measure of damages which would result in a lesser sum than they would be technically entitled to. The request has been granted.

8. Charles Kurlan testified that 10,000 yards were woven.