### PACIFIC STEAM WHALING CO. v. GRISMORE et al.

(Circuit Court of Appeals, Ninth Circuit. June 2, 1902.)

#### No. 758.

**1. CARRIERS—STEAMSHIP—OVERCROWDING PASSENGERS.**

A steamship is liable in damages to passengers who, although they were sold second-class tickets, were given only the accommodations of steerage passengers, and who suffered great discomfort from lack of proper food and water and from being overcrowded in unclean and badly ventilated quarters. While the obtaining of an inspector's certificate permitting the vessel to take more passengers than she actually carried may relieve her from prosecution for the statutory penalty for carrying an excessive number, it does not relieve her from liability to passengers for a violation of her implied agreement to furnish them with reasonable accommodations.

**2. ADMIRALTY PRACTICE—TAKING TESTIMONY ON APPEAL.**

The parties to a suit in admiralty should make reasonable effort to obtain all testimony material to the issues in the trial court, and the practice of taking further testimony after an adverse decision, to be used in the appellate court, is one not to be encouraged.

**3. CARRIERS—STEAMSHIP—DELAY IN LANDING PASSENGERS' EFFECTS.**

Libelants contracted for the carriage of themselves and their baggage and effects by a steamship from San Francisco to Nome in the spring of 1900. There was no landing place at Nome, and all landing had to be done by means of lighters. The tickets provided that the voyage should end at the place of anchorage, and that the landing was no part of the contract. After they were put on shore libelants were compelled to wait in some cases 10 days, and until the ship had been to other ports and returned, before receiving their baggage, effects, and freight, by reason of which they suffered exposure, expense, and loss on account of the delay, which was due, to some extent at least, to the fact that the ship was unnecessarily overloaded. *Held,* that the stipulation in the

contracts did not exonerate the ship from liability in damages under the circumstances shown, even if enforceable within reasonable limits, owing to the condition of the port and the prevailing custom.

Appeal from the District Court of the United States for the Northern Division of the District of Washington.

For opinion below, see 110 Fed. 221.

Gorham & Gorham and Gorham, Brown & Gorham, for appellant.
P. P. Carroll and John E. Carroll, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge.  In the court below three separate libels and one intervening libel were filed against the steamship Valencia to recover damages alleged to have been suffered by various libelants (11 in number) by reason of an alleged breach of contract for the transportation of themselves and their personal effects on the Valencia from the port of San Francisco to the port of Nome, Alaska, during the season of 1900.  The causes were, after the trial, consolidated.  The Valencia, according to the certificate of inspection made by the proper officers at San Francisco, Cal., had 37 state rooms and 128 berths, and was allowed to carry 503 passengers, viz.: "128 first-cabin, ——— second-cabin, and 375 deck or steerage passengers." A further certificate was obtained from the inspectors to the effect that the Valencia had provided accommodations for, and was authorized to carry, 99 second-cabin passengers.  This, as will appear from the testimony hereinafter referred to, was an inadvertent error, and was intended for "99 second-class passengers."  On her voyage from San Francisco the local inspectors at Seattle increased the limit of passengers which the Valencia was entitled to carry to 615.  The evidence shows that each of the libelants who purchased "second-class" tickets in San Francisco paid therefor the sum of $75, and from representations made to them understood that they were to have second-class accommodations on board the steamship; but as a matter of fact they were treated as steerage passengers and received no other accommodations.  The number of passengers at San Francisco was 475, and this number was increased by 15 from Seattle. The tickets purchased by the libelants had printed thereon, among other things:

"Ship's voyage and all responsibility under this contract end on arrival at usual place of anchorage.  Landing is no part of this contract.  This company will, where it may find it practicable, assist in landing without charge to passengers, but such act on its part shall not be deemed to be done under this contract, and in no case shall its liability for damage, injury, or loss of whatsoever nature exceed the value of the conveyance used in landing."

The damages sought to be recovered by the libelants herein are for failure on the part of the steamship company, and of its master, officers, and crew, to furnish second-class quarters (steerage being furnished instead); failure to furnish food equal to that furnished first-class passengers; failure to furnish proper and adequate accommodations, sufficient wholesome and properly cooked food and pure water; and the detention of libelants' effects on board for 10 days

or thereabouts after the arrival of the vessel at Nome. The damages resulting therefrom are alleged to be for the suffering in health and mind, mental pain and worry, sickness and distress, loss of personal effects, and incapacity and deprivation of earning a livelihood, etc. The court below was of opinion that, while the various libelants exaggerated their grievances in many respects, the evidence in the case was indisputable that the passengers did suffer great discomfort for want of proper food, and that they were so crowded in their quarters, in which they had to sleep and where their meals were served, as to constitute a violation of the implied agreement of the carrier to provide reasonable accommodations for the number of passengers engaged to be carried, "and to not subject the passengers to such treatment as all men must condemn as inhuman." The court also found that there was considerable delay in landing the baggage and effects of the passengers at Nome, and rendered a decree in favor of certain libelants aggregating about $2,700.

The case seems to have been fairly tried and to have received the careful attention of the presiding judge. A review of the evidence upon which the decree was based would serve no useful purpose. The testimony was not taken in the presence of the judge below, and for that reason we have examined it closely, and are of opinion that the district court arrived at the correct conclusion in regard thereto. Much of the evidence is of a sickening, disgusting, and unpleasant nature. After the decree was rendered the appellant obtained an order from this court permitting the taking of additional testimony,—a practice which, by the way, is becoming entirely too common. Parties should endeavor to procure all the testimony material to the issues presented by the pleadings in the first instance. The practice of bolstering up a lost cause by additional testimony ought not to be encouraged. But in this case the additional testimony has no special bearing upon the discomfort of the passengers on the voyage, but was offered to explain certain points discussed by the court as to the overcrowding of the ship, and, as appellant claims, to show that the permit of the United States inspectors of steam vessels, of date May 21, 1900, to carry an increased number of passengers on the steamship beyond the number allowed by the certificate of inspection then in force, was not requested or granted after the capacity of the steamship under her certificate of inspection had been oversold, but, on the contrary, it was before the capacity of the steamship had been reached by the sale of tickets, and before it was at all certain that the vessel's capacity would all be taken; that the permit issued for 99 additional second-cabin passengers was intended for 99 second-class passengers, and the use of the word "cabin" in lieu of "class" in the permit, indorsed on the certificate of inspection, was an inadvertent error in the office of the United States inspectors of marine vessels at San Francisco, where it was issued. This character of testimony might have some tendency to relieve the steamship company from censure or criticism to which it might otherwise be subject, and might be deemed sufficient to relieve the company against any prosecution for the statutory penalty for carrying an excessive number of passengers, but it does not relieve it from

liability to the passengers if any damage to them was occasioned thereby. It is claimed that the conditions prevailing at Nome in 1900 were not such as to render void, as against public policy, a contract for transportation providing for delivery at anchorage and providing that landing was no part of the contract. Ordinarily, parties are bound by the strict letter of their contract. The general rule is that delivery of goods belonging to passengers must be in accordance with the customs and usage of delivery, and, if so made, the carrier will be discharged from responsibility. Constable v. Steamship Co., 154 U. S. 51, 63, 14 Sup. Ct. 1062, 38 L. Ed. 903. But this general rule and the reasons upon which it is founded do not reach the conditions existing in the present case. The testimony fails to convince us that the baggage, freight, and personal effects of the libelants were delivered "as soon after the arrival as the conditions of the weather and sea in the open roadstead at Nome would permit," as claimed by the appellant. The steamship arrived at Nome on the night of June 17th, and the master testified that the passengers "were all ashore within 48 hours." His version of the delay in the landing of the baggage and freight appears from the following questions and answers:

"Q. Mr. Birt, one of the libelants, and Mr. White, an intervening libelant, complain that freight upon which he had paid fifty-two dollars charges, I think, goods and merchandise, were not delivered to him until ten days after the seventeenth day of June, and until the ship had arrived at Nome and departed and gone to Golofnin Bay and York Bay and come back to Nome. A. That may possibly be. Q. Can you explain it? A. It was put on the beach, and he did not come after it. The freight was landed on the beach within seven days. I sailed from there on the twenty-fourth, with everything out. Q. Did you have occasion to land any Seattle or San Francisco shipments at Nome upon your return to Nome from Golofnin Bay or York? A. Yes, sir. Q. Why were not they landed on the first arrival? A. Because we could not get the lighters to take it. In the meantime we ran to Golofnin Bay. We could not get any lighters, we understood, for thirty-six hours, and we ran to Golofnin Bay, and were gone twenty-four hours, and came back and got one lighter, and they said they could not get us another for thirty-six or forty-eight hours, and in the meantime we went down to Cape York and landed the rest of the freight, and was back there in twenty-eight hours."

The testimony of the libelants shows that they were put to the expense and inconvenience of purchasing food and securing sleeping apartments in tents while waiting for the delivery of their own tents, provisions, machinery, tools, etc., and were also deprived of the opportunity of laboring or working ashore. The testimony in its entirety supports the views entertained by the lower court, that the libelants were subjected to unreasonable delay, privations, and losses that would not have occurred if the ship had not been "unnecessarily overloaded." The absence of lighters and the state of the weather were not the only causes of discomfort and delay. The trial court was called upon to deal with an exceptional case, arising at a time of great anxiety and excitement as well on the part of the passengers as on the part of the steamship company. Time and opportunity were important and valuable; neither could well brook delay. The task imposed upon the trial court of measuring the duty of the re-

spective parties so as to be fair to all, in order to meet the ends of justice, was to some extent difficult.   Under all the circumstances of this case, we are of the opinion that the carrier is not relieved from liability for the freight and baggage by reason of the language in the contracts that the landing should not be deemed a part of the voyage.   The custom and usage of landing passengers on a bleak shore without the delivery of their baggage and effects until after the ship goes to other places to deliver other freight, and remains away for a week or more, if such custom existed, is one that should be more honored in the breach than the observance, and ought not to be sanctioned or encouraged by the courts.   The law, as well as humanity, demands that reasonable efforts should be made by the carrier to protect the rights of passengers in this respect.   In Post v. Koch (D. C.) 30 Fed. 208, Benedict, J., said, "Landing is part of the contract with a passenger."   The privilege of contracting for a limitation of liability is allowable only within such limits as are just and reasonable and consistent with the sound policy of the law. Michigan Cent. R. Co. v. Mineral Springs Mfg. Co., 16 Wall. 324, 21 L. Ed. 297.   See, also, The President (D. C.) 92 Fed. 673, 675. There is no division of the damages allowed to the several libelants, and nothing in the record to show what proportion thereof was allowed for the delay in landing or loss of freight as distinguished from the discomforts of the passengers during the voyage.   The allowance was for a lump sum to each libelant.   The court explains the allowance as follows:

"The several sums awarded being, in my opinion, reasonable compensation for personal discomfort, extra expenses, losses of baggage and freight, and consequential losses on account of delay in delivering their baggage and freight; and in fixing the amount of damages I have made due allowance for exaggerations in evidence, for contributory negligence on the part of the libelants, and for unnecessary expense to the claimant in defending the ship, on account of claims for excessive damages."

The record does not, in our opinion, disclose any error which would justify this court in setting aside the decree.   The decree of the district court is affirmed, with costs.