## THE HERMOSA.

## MAGGIO et al. v. MEXICO ARIZONA TRADING CO.

## No. 6647.

Circuit Court of Appeals, Ninth Circuit.

March 21, 1932.

Montgomery Phister and Loucks & Phister, all of San Pedro, Cal., and John C. McHose and Young, Lillick, Olson, Graham & Kelly, all of Los Angeles, Cal., for appellants.

Harold M. Sawyer, Alfred T. Cluff, and Daniel W. Evans, all of San Francisco, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges.

SAWTELLE, Circuit Judge.

This appeal was taken by the claimants of the motorship Hermosa from a decree holding the vessel and her owners liable for the loss of the greater part of a cargo of tomatoes shipped by the appellee from Topolobampo, Sinaloa, Mexico, to San Pedro, Cal., in May, 1929.

Much of the testimony was conflicting. Since we believe that there was substantial evidence to sustain the findings of the trial court, we are adopting the general narrative of the material facts as outlined by such findings.

The libelant-appellee is an Arizona corporation, engaged, among other things, in the business of growing tomatoes in the Fuerte Valley, state of Sinaloa, Mexico, and of importing tomatoes into the United States.

The Hermosa is a sea-going vessel, capable of a normal cruising speed of ten and one-half nautical miles, and equipped with a refrigerating or cooling plant whereby her holds may be maintained at low and even temperatures.

On or about April 18, 1929, at Los Angeles, the appellee and William J. Maggio, as managing owner of the respondents-ap-

pellants' motorship, entered into a contract of affreightment or charter party, for the carriage on the Hermosa from Topolobampo to Los Angeles harbor, of a full cargo of fresh tomatoes, with the option to the appellee, at the conclusion of the voyage, for the carriage of a second cargo of tomatoes between the same ports for like compensation as that provided for the first voyage, and upon the terms of the same contract of affreightment.

The material provisions of the charter-party or contract of affreightment are as follows:

"This cargo is to be loaded by the Mexico Arizona Trading Company as soon after the arrival [at Topolobampo] as possible. Vessel then to be immediately dispatched for San Pedro at full economical speed. * * *

"M.S. 'Hermosa' to furnish sufficient tarpaulins to cover crates of tomatoes carried on deck and exposed to the sun, and the crew of said vessel are required to cover the cargo of tomatoes during the daytime to protect same from sunlight, and to remove tarpaulins at nighttime for the purpose of cooling off cargo, all hatches and vents to be left open, weather permitting, in order to give cargo best ventilation possible. * * *

"It is further understood and agreed that the M.S. 'Hermosa' shall be absolved from all liability for deterioration or decay of said cargo of tomatoes."

The first voyage provided for in the above contract was successfully accomplished. On that trip, a supercargo, employed by the appellee, accompanied the tomatoes. Within the time required by the contract, the appellee exercised its option for a second voyage, and on May 4, 1929, the Hermosa left Los Angeles harbor for Topolobampo, where she arrived on May 9, 1929.

The motorship finished discharging her down cargo at Topolobampo on May 10, 1929, and was ready for loading tomatoes for the second voyage. No supercargo was to accompany the consignment.

On May 10 and 11, 1929, the appellee loaded on board the Hermosa 7,725 lugs of fresh green tomatoes, grown in the vicinity of Los Mochis, Sinaloa, about sixteen miles by rail from Topolobampo. The loading was completed at about noon on May 11. Of the 7,725 lugs, 3,600 were stowed in the after refrigerated hold of the vessel, and the remainder in the 'tween decks forward, on the after deck, and elsewhere above the main deck.

Under ordinary circumstances, and at her full economical speed, the Hermosa was capable of making the passage from Topolobampo to Los Angeles harbor in about four and one-half days.

Upon completion of the loading, the vessel failed to sail immediately for her destination, as required by the charter party, but remained at the dock until approximately 3 p. m. the following day, May 12. This delay was due to the conduct of the master of the motorship. At about 11 o'clock in the forenoon of May 11, Captain H. J. Rookus, the master, left the Hermosa and went ashore to Topolobampo, where he became intoxicated and remained so until 3 o'clock in the afternoon of the following day, May 12. At that day and hour, still incapacitated, the master was assisted on board, and, immediately thereafter, the vessel sailed for Los Angeles under the direction of one of her crew.

After this delay of twenty-seven hours caused by the captain's intoxication, the Hermosa proceeded on her voyage without incident until about 10:30 a. m. on May 13, when a valve seat in the main engine circulating pump broke, interrupting the cooling of the engine and necessitating its being stopped. After a delay of an hour and three-quarters, the engineer disconnected the vessel's general service pump from the refrigerating plant and attached it to the main engine. This was done for the purpose of supplying water to the main engine.

The main engine was then started, and the vessel proceeded into San Lucas Bay, Lower California, Mexico, to attempt repairs. The engineers, however, were unable to mend the broken valve seat, or otherwise to operate the main engine without using the general service pump for supplying water thereto.

After a further delay of about four hours, at 4 p. m. on May 13, the vessel proceeded on her voyage, using the general service pump to supply water to the main engine, and continuing to do so for the rest of the trip. The operation of the refrigerator plant ceased with the disconnecting of the general service pump from at about noon on May 13, and was not resumed for the rest of the voyage. During all of that time the tomatoes in the afterhold of the Hermosa were without refrigeration.

There is no positive evidence as to the cause of the breaking of the valve seat, but the court found that the mishap was due to defects in the metal of the seat, or, as suggested by the engineer, to a rusting away of

the casting beneath the seat, which conditions must have existed when the vessel left Los Angeles harbor at the commencement of the voyage. There were eighteen similar valve seats in the pumps of the Hermosa. The vessel, however, carried no spare valve seats or any tools or materials by which a valve seat might be fabricated or by which the broken one might be repaired.

The Hermosa arrived at Los Angeles harbor at about 2:30 p. m. on May 17, 1929. She was delayed, as we have seen, for twenty-seven hours before leaving Topolobampo, and was further delayed about five and one-quarter hours because of the breakdown of her pump. Had it not been for these delays, the Hermosa presumably would have arrived at her destination early in the morning of May 16.

Upon discharge of the vessel's cargo, the 3,600 lugs of tomatoes that had been stowed in the afterhold were found to be completely yellowed and cooked by their own heat, generated as a result of the cessation of refrigeration in the unventilated hold, following the substitution of pumps on May 13. The remainder of the tomatoes, which were loaded in the 'tween decks and elsewhere above the main deck, were badly overripened and detriorated, which condition is apparently accounted for by the undue prolongation of the voyage, the additional exposure to the sun, and the lack of ventilation while the vessel lay motionless at Topolobampo and San Lucas Bay. All of the tomatoes stowed in the hold and some of the others were so badly damaged as to be unsalable, and were taken to the city dump. The remainder, after being reconditioned, were sold by the appellee at Los Angeles for a price less than the market price for tomatoes in sound condition.

Upon completion of the discharge of the tomatoes, the appellee paid to the owners of the Hermosa $5,500 as freight money, as required by the contract of affreightment.

The lower court found that the Hermosa was unseaworthy in several respects, including that of a defective refrigerating plant and that of having an incompetent and irresponsible master. The court also found that the damage to the tomatoes was due to the unseaworthiness of the vessel, and that "it is not true that said damage would have happened if the vessel had sailed from Topolobampo for Los Angeles harbor immediately on the completion of loading" the tomatoes.

As conclusions of law, the trial court found that the delay of twenty-seven hours

in sailing from Topolobampo, after the completion of loading, was unjustified and unexcused, and was a deviation, for which the Hermosa and her owners are liable for all damage to the shipment; and that there was a breach of the warranty of seaworthiness implied in the contract of affreightment.

The pivotal fact in issue, in our view of the case, is whether or not the delay at Topolobampo amounted to a deviation. In our view of the case, it is not necessary to consider the question of seaworthiness.

The vessel was loaded on May 11, but did not sail until May 12. Topolobampo is a bar harbor, and the Hermosa was unable to get over the bar except in the afternoon, at high tide. The appellee contends that loading was completed at 11 o'clock in the morning of May 11, and that the boat missed the tide and failed to sail that day through the fault of the drunken master. The appellants insist that the loading was not completed until between 2 and 3 o'clock in the afternoon of May 11, too late to catch the tide that day, that the consequent delay was not the fault of the ship, and that therefore it could not amount to a deviation.

As we have said, we believe that the findings of the lower court, to the effect that there was an unjustified deviation, were correct and were supported by substantial evidence. But the difficulty is that appellants have filed a stipulation and a motion for leave to take new testimony bearing upon the question of deviation, which question, as we have stated, we hold to be controlling here.

We will consider first the motion to take new testimony. In effect, the appellants claim surprise, in that two depositions taken at Nogales, Ariz., on September 10, 1930, six days before the commencement of the trial, contained the first intimation of "the contention of libelant that there had been an initial delay of twenty-four hours at Topolobampo caused by the alleged drunkenness of the captain of the 'Hermosa,' and that libelant would claim that said delay amounted to a deviation."

Counsel for the appellants insist that thereafter they acted "as promptly and effectively as was possible." A chronology of events, as disclosed by the appellant's brief, by the apostles on appeal, and by the documents filed in support of the motion to take new testimony, leads us to disagree with the appellants on this point.

In the first place, the original libel in rem and in personam, filed on August 6, 1929, alleged in general terms that the respond-

ents-appellants "unduly delayed said voyage and deviated from the course thereof, contrary to the requirements of the said charter-party."

The "Amendment to Libel," specifically setting forth the facts of deviation, was filed on September 16, 1930, on the day the trial opened. On the same day, counsel for the appellants stated that they had no objection to the filing of the amended libel, and that they understood that the court would allow them to take the depositions of two witnesses who were experts "in respect to tomatoes and the condition of tomatoes."

Nothing was then said about surprise on the deviation issue. Counsel for the appellee announced that he would consent to a reasonable time for the taking of depositions, as he did not "want counsel to submit his case without a proper presentation of testimony." It is also to be noted that the trial court was most generous in the matter of granting delay for the production of additional evidence.

"With that statement, we are ready," counsel for the appellants announced. The trial proceeded and was completed on September 18, 1930.

According to counsel for the appellants, they "immediately endeavored to discover evidence which would establish the truth or falsity of the testimony of Adams and Shepley [as to the alleged deviation]."

It was not until May 4, 1931, seven and one-half months after the close of the trial, that the appellants were informed "that a man by the name of John Davidson, Lloyd's agent at Guaymas, should be able and competent to make the investigation."

█ Considering the fact that Topolobampo is in easy communication from Los Angeles by rail, mail, boat, and telegraph, we do not believe that, according to appellant's own statements, they have made a showing of due diligence in presenting their evidence in the court below. Appellants themselves are the owners of a motorship that, as we have seen, can make the trip from Los Angeles to Topolobampo in four and one-half days. There is no reason shown why they could not have sent their own representatives direct to the Sinaloa port, instead of waiting seven months before they found an agent of Lloyd's at Guaymas, Sonora, "some four hundred miles from Topolobampo by rail."

In The Mabey, 10 Wall. (77 U. S.) 419, 420, 19 L. Ed. 963, the Supreme Court said:

"No excuse is shown in the papers, on which the motion is founded, why the witnesses named, and proposed to be examined, were not examined in some one of the courts below before the hearing there. The affidavit simply states that the testimony of these witnesses is material, as advised by counsel.

"This is not in accordance with the practice of the court. Some excuse, satisfactory to this court, should be shown for the failure to examine them in the courts below, such as that the evidence was discovered when it was too late to procure such examination, or that the witnesses had been subpoenaed and failed to appear, and could not be reached by attachments and the like. * * *

"It is quite apparent, if commissions were to be allowed by this court to issue as a matter of course, on a formal application under the twelfth rule, without requiring any excuse for not taking the evidence in the usual way before the courts below, the privilege would be open to great abuse, disturbing the orderly proceedings in courts of admiralty. Instead of taking proofs in the cause in the courts below, and there thoroughly trying it, much of the evidence could safely be omitted, relying on the new evidence in this court. There is no hardship upon the parties in guarding against this abuse with great care and strictness, as they have two opportunities to procure the attendance and examination of the witnesses before they come here on appeal: first, before the District Court, and again before the Circuit."

This court has likewise frowned upon the proposed method of trying an admiralty case: "After the decree was rendered the appellant obtained an order from this court permitting the taking of additional testimony,—a practice which, by the way, is becoming entirely too common. Parties should endeavor to procure all the testimony material to the issues presented by the pleadings in the first instance. The practice of bolstering up a lost cause by additional testimony ought not to be encouraged." Pacific Steam Whaling Co. v. Grismore et al. (C. C. A.) 117 F. 68, 70.

See, also, The Juniata, 91 U. S. 366, 367, 23 L. Ed. 208; Taylor v. Harwood et al., Fed. Cas. No. 13,794; The Busy, Fed. Cas. No. 2,232.

We next turn to the stipulation already on file in this court. It is to the effect that the appellants are prepared to procure witnesses who will establish the fact that the records of the collector of customs at Topolobampo contain notations that the Hermosa commenced the loading of tomatoes at 3 p. m.,

May 10, 1929, and completed such loading at 6:30 p. m., May 11, 1929. It is agreed by the appellee that, if the Hermosa was to cross the bar on May 11, she had to leave her dock not later than 2 p. m. Otherwise, she would have to wait another day.

According to a chronological table prepared by the appellants, the hour on May 11 when the Hermosa completed the loading is variously fixed as follows:

Appellee's version: Before noon.

Appellant's version: 3 p. m.

Official records: 6:30 p. m.

Thus it will be seen that the customs records at Topolobampo set the hour of completion three and one-half hours later than even the appellants claim to have been the correct time. Are the customs records correct, and the appellant's own witnesses wrong?

The answer to this troublesome question is found in the appellant's own brief: "The Mexican authorities having issued the permit to load, and having furnished the necessary inspectors, were not concerned about the *actual time* loading started. When they were officially notified that loading was completed, and they officially called off the inspectors, the loading was officially completed. The captain's presence was *not required to notify the Mexican authorities loading had been completed.*" (Italics are the appellants'.)

Thus it will be seen that the appellants concede that the Mexican authorities were not concerned with the actual time when either the commencement or the completion of the loading took place. They were merely concerned with the time the permit was issued, on the one hand, and with the time "they were officially notified that loading was completed."

This court, however, *is* concerned with the actual time loading was completed; for it is upon this fact that the entire case hinges. If the actual loading was completed before 2 p. m. on May 11, and the vessel's departure was delayed by the master's intoxication, the appellants are liable for a deviation; otherwise, not. We are concerned here with actual facts, and not with the hour at which the Topolobampo customs authorities were notified of those facts.

If the loading was completed before noon of May 11, the vessel could have cleared the bar before 3 p. m. that same day, save for the master's carousal.

■ On conflicting testimony, the court below found that the loading was completed at about noon. We are not disposed to disturb this finding, or to be impressed with a stipulation that admittedly does not establish the actual loading time.

In Luckenbach S. S. Co. v. Campbell, 8 F.(2d) 223, 224, the late Judge Rudkin, of this court, said: "There was ample testimony tending to prove that the working place was unnecessarily dark and dangerous, and whether the appellant, the deceased, or his fellow servants were responsible for that condition was a question of fact for the determination of the court below. The findings of that court, based as they were on competent testimony, will not be disturbed on appeal, in the absence of some plain or obvious error, and none such is here apparent."

Again, in The Mazatlan (C. C. A.) 287 F. 873, 875, the same learned jurist said: "If these findings of the court are sustained by the testimony, it becomes unnecessary to consider many incidental questions presented by the record and discussed by counsel on the argument. In this class of cases the rule is well settled that an appellate court will not disturb the findings of the trial court, except for manifest error. [Many cases cited.]"

■ We find no such error in the record before us, and accordingly we hold that the appellants were guilty of deviation, as a result of the unnecessary detention of the Hermosa from noon, May 11, to 3 p. m., May 12.

Finally, we advert to the legal consequences of such deviation.

In Carver on Carriage of Goods by Sea (6th Ed.) § 284, p. 393, we find the following language:

"And the voyage ought to be commenced without needless delay. If there has been an improper loss of time after the goods have been delivered by the shippers for shipment, and damage or loss results, the shipowner is answerable. Thus, where there has been negligent delay in provisioning the ship so that she was detained at the port of loading, and was, consequently, frozen up there for a long time, the shipowner was liable to the charterers for consequent damage. * * *

"The voyage must be prosecuted without unnecessary delay or deviation. The shipowner's undertaking is that he will be diligent in carrying the goods on the agreed voyage, and will do so directly, without any unnecessary deviation. * * *"

Again, in section 287, on page 399 of the same eminent text, we find: "A voluntary and unwarranted deviation, therefore, displaces the original contract."

In this connection, it is to be observed that in the instant case the applicants are claiming exemption from liability under the clause as to damage from "deterioration or decay," hereinbefore quoted. If the charter party is swept away by the deviation, this saving clause, of course, cannot apply.

Again quoting from section 287, supra, we find:

"When a vessel has deviated from her proper course, the shipowner is not only liable for the delay, but he becomes responsible for any loss or damage that happens to the goods. He is not protected by the exception of perils in the contract.

"Thus in Thorley v. Orchis Co., [76 L. J., K. B. 595] locust beans were shipped in a vessel described as 'lying at Limassol and bound for London.' The vessel did not proceed direct to London, but went out of her way to two ports in Asia Minor; on arrival in London, the beans were damaged through the negligence of the stevedores; the shipowners were held liable notwithstanding an exception of such negligence in the bill of lading. There is no need, the Court held, to show that the loss which has occurred is traceable to the deviation."

"A deviation is such a serious matter, and changes the character of the voyage so essentially, that a shipowner who has been guilty of a deviation cannot be considered as having performed his part of the bill of lading contract, but something fundamentally different, and therefore he cannot claim the benefit of stipulations in his favour contained in the bill of lading. In what position, then, does he stand? He has carried the goods to their place of destination, and is therefore entitled to some remuneration for that service, of which the owner of the goods has received the benefit. The most favourable position which he can claim to occupy is that he has carried the goods as a common carrier for the agreed freight. I do not say that in all cases he would be entitled as of right to be treated even as favourably as this."

It is true that, as appellants point out, the same learned text, in section 16, page 19, indicates that, only if the "consequences" of the deviation "would not have operated but for that," the shipowner is not excused; but, regardless of this apparent contradiction, we believe that the foregoing quotation from section 287 correctly states the law, and that the deviating shipowner is an insurer, unless, again borrowing the language of Carver, "such loss or damage to cargo would have occurred notwithstanding the deviation."

Numerous decisions of the Supreme Court sustain this view. Early in the history of American jurisprudence, Chief Justice Marshall succinctly stated the principle, in Oliver v. Maryland Insurance Co., 7 Cranch (11 U. S.) 487, 490, 3 L. Ed. 414: "Unquestionably an idle waste of time, after a vessel has completed the purposes for which she entered a port, is a deviation which discharges the underwriters. If the Comet remained, without excuse at Barcelona an unnecessary length of time while her cargo was ready for her and she might have sailed, she would remain at the risk of the owners—not of the underwriters."

That a deviation, if established, subjects the carrier to the liability of an insurer, was clearly indicated by the Supreme Court as early as 1894, in the case of Constable v. National Steamship Co., 154 U. S. 51, 66, 14 S. Ct. 1062, 1068, 38 L. Ed. 903: "It is claimed, however, that the berthing of this ship at a pier other than her own was in legal effect a deviation, which rendered the company an insurer of the cargo discharged at such pier without notice, until its actual delivery to the consignee. In the law maritime, a deviation is defined as a 'voluntary departure without necessity, or any reasonable cause, from the regular and usual course of the ship insured' (1 Bouv. Law Dict. 417; Hostetter v. Park, 137 U. S. 30, 40, 11 S. Ct. 1 [34 L. Ed. 568]; Davis v. Garrett, 6 Bing. 716; Williams v. Grant, 1 Conn. 487 [7 Am. Dec. 235]); as, for instance, where a ship bound from New York to Norwich, Conn., went outside of Long Island, and lost her cargo in a storm (Crosby v. Fitch, 12 Conn. 410 [31 Am. Dec. 745]), or where a carrier is guilty of unnecessary delay in pursuing a voyage, or in the transportation of goods by rail (Michaels v. N. Y. Central Railroad, 30 N. Y. 564 [86 Am. Dec. 415]). But, if such deviation be a customary incident of the voyage, and according to the known usage of trade, it neither avoids a policy of insurance nor subjects the carrier to the responsibility of an insurer. [Cases cited.]"

Again, in The Willdomino v. Citro Chemical Co., 272 U. S. 718, 725, 47 S. Ct. 261, 262, 71 L. Ed. 491, the court said: "The Circuit Court of Appeals [300 F. 5], we think, rightly held that the Willdomino made an inexcusable deviation from the permitted course when she went to North Sydney. Consequently she became liable as an in-

surer for any damage suffered by the cargo. [Cases cited.]" See, also, The Sarnia (C. C. A. 2) 278 F. 459, 461, 463, 464, certiorari denied 258 U. S. 625, 42 S. Ct. 382, 66 L. Ed. 797; St. Johns N. F. Shipping Corporation, Owner, etc. v. S. A. Companhia Geral Commercial do Rio de Janeiro, 263 U. S. 119, 124, 125, 44 S. Ct. 30, 68 L. Ed. 201; The Malcolm Baxter, Jr., 277 U. S. 323, 331, 48 S. Ct. 516, 72 L. Ed. 901; The Citta Di Messina (D. C.) 169 F. 472, 475.

The foregoing cases, it is true, all involve common carriers; and the appellants insist that: "Under the rule announced by the District Court, a vessel would be liable after a deviation for damages to cargo caused by some occurrence with which the deviation had no connection whatsoever. This is not correct particularly in the case of a *private carrier.*"

The authorities, however, do not sustain this attempted distinction between a private and a common carrier, so far as concerns liability for voluntary deviation. Nor do the appellants cite any case in support of such distinction.

In Scrutton on Charter Parties and Bills of Lading (12th Ed.), art. 99, pp. 294, 295, the rule is thus stated:

"In the absence of express stipulation to the contrary, the owner of a vessel, whether a general ship or chartered for a special voyage, impliedly undertakes to proceed in that ship without unnecessary deviation in the usual and customary manner. * * *

"The effect of deviation is to displace the special contract of the charter-party or bill of lading, together with all exceptions therein. The shipowner will, therefore, be liable to the charterer or cargo owner for any loss or damage which the goods sustain, unless he can shew that the loss or damage was occasioned either by the act of God, or by the King's enemies, or by inherent vice of the goods, and that the said loss or damage must equally have occurred even if there had been no deviation. And it is immaterial whether the loss or damage arises before, or during, the deviation, or after it has ceased."

See, also, Carver, supra, section 16, page 19, as to the latter part of this rule, dealing with the sole defense allowable to the shipowner in case of deviation; namely, that the loss would have occurred, regardless of such deviation.

In Globe Navigation Co., Limited, v. Russ Lumber & Mill Co. (D. C. Cal.) 167 F. 228, 231, a case that involved the *chartering* of the *whole* of a steamship, Judge De Haven said:

" * * * The rule seems to be that, when there has been an unjustifiable deviation upon the part of the vessel in the prosecution of her voyage, the shipowner is deprived of the benefit of exceptions contained in the contract of affreightment, unless it affirmatively appears that the losses would have happened if there had been no deviation. [Authorities cited.]"

That case was cited with approval in The St. Johns N. F. (C. C. A. 2) 280 F. 553, 557; affirmed St. Johns N. F. Shipping Corporation, Owner, etc. v. S. A. Companhia Geral, etc., supra.

In Knox v. The Ninetta, Fed. Cas. No. 7,912, the shipment was "made under an agreement that no other freight should be taken." Nevertheless, according to the libel, "master, in violation of his contract, did not proceed with the said cargo directly to the port of Philadelphia, but deviated from his course and went into the river Piankitank, and there took in a deck load of wood, whereby the vessel was overloaded and caused to leak, in consequence whereof the wheat was damaged, injured, and rendered unmarketable," etc.

There it was contended that the wood "in no way interfered with the safe sailing or navigation of the schooner," just as here the appellants contend that "the correct rule is that a vessel is liable, where there is a deviation, for damage proximately caused by the deviation."

In The Ninetta Case, where, as here, the contract was for private carriage, the court said: "The greatest difficulty I have had in this case has been to determine whether this damage was occasioned by the fault or improper conduct of the captain, in putting into the Piankitank; but when I reflect that this was in violation of an express contract with the shipper, who was put to considerable trouble and expense in order to obtain the exclusive use of the vessel, I think the party who violates such a contract, and takes in additional cargo, without the consent of the first shipper, assumes the risk and responsibility of an insurer, and should be liable for any loss that may afterwards occur."

That case was cited with approval in The Sarnia (C. C. A. 2) 278 F. 459, supra.

There is no suggestion that the court reached its conclusion because it regarded the ship as a common carrier since the master had breached the contract of private carriage; on the contrary, the learned judge asserted that the party who violates such a contract assumes the liability of an *insurer.*

The entire trend of authorities, so far as we have been able to discover, indicates that, as to the effect of a voluntary deviation from the contract of carriage, whether private or common, the liability of the shipowner is that of an insurer.

As we have seen, this liability, once incurred, can be avoided by the shipowner only by an affirmative showing that the loss *must* have occurred, even without the deviation. The appellants did not discharge this burden of proof, and the trial court correctly found "that it is not true that the said damage to the said tomatoes would have happened if the vessel had sailed from Topolobampo * * * immediately on the completion of loading. * * *"

Accordingly, we hold that the lower court's findings of fact and conclusions of law were correct, and that the decree should be affirmed.

Decree affirmed.