HOSTETTER *v.* PARK.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF PENNSYLVANIA.

No. 3.  Argued and submitted October 21, 1890. — Decided November 3, 1890.

A bill of lading for goods shipped at Pittsburg for New Orleans, on a barge towed. by a steam-tug, stated that the goods were " to be delivered without delay," " the dangers of navigation, fire, and unavoidable accidents excepted." The barge was taken safely down the Ohio River to Mt. Vernon, and was then towed up the river and took on cargo at several places not over about three miles above Mt. Vernon. After making the last landing she struck an unmarked, unknown and hidden object below the surface of the water, which caused her to sink, without negligence on her part or that of the tug, and by an unavoidable accident, thereby damaging the shipper's cargo. On a libel in admiralty, *in personam*, by the shipper against the owners of the barge and the tug, the Circuit Court, on an appeal from the District Court, which had dismissed the libel, found the foregoing facts, and that it always had been the general and established usage, in the trade in question, for a tug and barges to follow the practice adopted in this case, and that such usage tended to cheapen the cost of transportation, facilitated business, and conduced

to the safety of the whole tow, and was, therefore, a reasonable usage. The libel having been dismissed by the Circuit Court: *Held,* on appeal,

(1) This court is concluded by the facts found by the Circuit Court;

(2) The usage in question is to be presumed conclusively to have been known to the shipper, so as to have formed part of the bill of lading, and to control its terms, and to have brought the accident within the exceptions therein;

(3) It is no deviation, in respect to a voyage named in a bill of lading, for a vessel to touch and stay at a port out of its course, if such departure is within the general and established usage of the trade, even though such usage be not known to the particular shipper;

(4) Parties who contract on a subject matter concerning which known usages prevail, incorporate such usages by implication into their agreements, if nothing is said to the contrary.

This was a libel in admiralty, *in personam,* brought in the District Court of the United States for the Western District of Pennsylvania, by David Hostetter and George W. Smith, copartners as Hostetter & Smith, against R. C. Gray and the executors of M. W. Beltzhoover, deceased, as owners of the steam-tug Iron Mountain and the barge Ironsides No. 3, to recover $10,182.76, with interest, for damages sustained by the libellants, by the loss of sundry boxes of bitters and other merchandise shipped by the libellants at Pittsburg on board the barge Ironsides No. 3, towed by the steam-tug Iron Mountain, to be transported from Pittsburg to New Orleans. The libel was filed March 4, 1880. The bill of lading for the shipment was made December 5, 1874, and the loss occurred December 18, 1874. The bill of lading stated that the articles shipped were " in good order and condition," and were " to be delivered without delay, in like good order, at the port of New Orleans, La. (the dangers of navigation, fire and unavoidable accidents excepted)."

The libel alleged that Gray and Beltzhoover were the owners of the tug and the barge at the time of the shipment and the loss; that the goods were shipped on board of the barge; that the tug, having the barge and other barges in tow, proceeded down the Ohio River and arrived safely at Mt. Vernon, Indiana, on December 17, 1874, and there took on board of the barge additional cargo; that the tug, instead of proceeding down the river and towards New Orleans without delay and

in accordance with the bill of lading, dropped or left all of the barges except the Ironsides No. 3, and wrongfully and without notice to the libellants deviated from and abandoned the voyage to New Orleans, by steaming up the Ohio River several miles to the town of New York Landing, in Henderson County, Kentucky, and there took on board of the barge additional cargo; that, on December 18, 1874, the voyage down the river was again undertaken, by attempting to pass for the third time over the distance between New York Landing and Mt. Vernon; that, shortly after leaving that landing, or in rounding out therefrom, or at a point about half a mile or a mile below, and before again reaching Mt. Vernon, the barge, being in tow of the tug and having on board the goods of the libellants, struck some unseen obstruction and sank in deep water, causing the loss and damage in question; and that such deviation and temporary abandonment of the voyage was contrary to the contract entered into by the bill of lading, and against the law governing common carriers.

The answer of the respondents averred that the goods were shipped by the libellants with the understanding and knowledge that the respondents had the right to complete the cargo of the barge at any place between Pittsburg and New Orleans where they might be able to secure the same, and to receive and discharge cargo upon and from the barge in accordance with the usage and custom of trade and navigation on the Ohio and Mississippi rivers. It denied that the steam-tug and the barges in tow of her abandoned their voyage and refused to proceed thereon without delay, and averred that with all possible despatch they took on said additional cargo at Mt. Vernon and at New York Landing; to which latter place, on the Ohio River, in the immediate vicinity of Mt. Vernon, the steam-tug towed the barge Ironsides No. 3, from Mt. Vernon, according to the usage and custom of navigation upon that river, and were only prevented from proceeding with the goods of the libellants towards New Orleans by reason of one of the dangers of navigation, which occasioned the loss of the goods and of the barge and its contents; that it was, at the time stated, and always since the transportation of goods by

means of barges towed by steam vessels first began on the Ohio and Mississippi rivers and their tributaries, had been, the uniform, continued, general and well and publicly known usage and custom of such vessels and barges to load partially at the port of departure, if that was necessary either by reason of the stage of water or lack of cargo, and to take on additional cargo at any place where the same might be had between the ports of departure and destination; that, on the voyage in question, the barge left Pittsburg partially laden and arrived at Mt. Vernon without having secured a full cargo; that, in securing additional cargo along the rivers navigated *en route* to the port of destination, it was at the time, and had been since barge navigation of those rivers began, the constant, general, well-known and uniform custom and usage for the owners or agents of the vessels and barges to land their fleets at the larger, safer, and more convenient landings along those rivers, and there meet and contract with shippers for the transportation of their goods, and then detach from the fleet the barge or barges designated to receive such cargo, if the cargo was not there, and send the barge or barges so designated to the place where the cargo might be stored, whether up, down or across the river, within such reasonable distance as might be reached without great or unreasonable delay or expense; that Mt. Vernon is a point where shippers within a radius of fifteen or twenty miles therefrom meet carriers upon the Ohio River, and is the place where shippers whose goods are received at New York Landing meet and contract with carriers for their transportation to points below; that, in pursuance of such general, uniform, constant and well-known usage and custom, the fleet of barges landed at Mt. Vernon, and the respondents there contracted with certain shippers whose goods were at New York Landing, a point between two and three miles above Mt. Vernon, to carry the same to New Orleans, and detached from the fleet the barge Ironsides No. 3, and the tug towed her to New York Landing, and there took on board of her additional cargo, with all possible despatch and without unreasonable delay; that, in rounding out to leave New York Landing, the barge, without fault, negligence, or want of skill

on the part of those navigating her or the steam-tug, ran upon and struck, in deep and navigable water, an obstruction unknown, unseen, unmarked and in no way indicated, and which could not have been seen, known or avoided by the exercise of any degree of skill, care or caution, by reason whereof the barge was sunk and totally lost and her cargo greatly damaged; that the voyage was not abandoned or wrongfully deviated from, but the action of the respondents in the premises was lawful, customary and right and in accordance with the established usage of the trade in which they were plying, which usage was well known to the libellants at the time of the shipment of their goods; and that the goods were damaged and lost through one of the dangers of navigation, within the exception of the bill of lading.

An amendment to the libel was afterwards filed, setting up that the sinking of the barge was not the result of an obstruction in the river, but was caused by negligent management on the part of the employés of the respondents, in that the barge, while at New York Landing, was overloaded on her port side with sacks of corn, so that she grounded, and, when pulled off by the steam-tug, careened to the port side with her cargo, so that a break occurred in her, causing her to sink.

The respondents answered this amendment by a general denial of its averments.

The District Court made a decree dismissing the libel, with costs. The opinion of Judge Acheson, the District Judge, reported in 11 Fed. Rep. 179, sustained the defence of usage. The libellants appealed to the Circuit Court, which court, held by Mr. Justice Bradley, dismissed the libel, with costs. The Circuit Court found the following facts and made the following conclusion of law:

"1. On December 6th, 1874, the steam tow-boat Iron Mountain, having in tow several barges (one called Ironsides No. 3), partly loaded with a miscellaneous cargo, left Pittsburg bound for New Orleans. The libellants shipped by the barges 2000 boxes of bitters and eighteen boxes of show-cards, which were placed on Ironsides No. 3, the bill of lading stipulating that the goods were 'to be delivered without delay, in like good

order, at the port of New Orleans, La. (the dangers of naviga-tion, fire, and unavoidable accidents excepted).' A copy of the bill of lading is annexed to the original libel.

" 2. The tow-boat and her barges, after taking on additional cargo at various intermediate places, arrived safely at Mt. Vernon, Indiana, 819 miles below Pittsburg, and landed to take on freight at the Mt. Vernon wharf-boat. The proprie-tors of the wharf-boat had engaged for the barges corn which lay piled in sacks at two or three farm landings on the Indi-ana shore, the furthest pile being about two miles above the wharf-boat. The tow-boat detached from the fleet the barge Ironsides No. 3, which was but partly loaded, and proceeded with it upstream to these piles. After loading this corn the boat crossed the river with the barge and took on corn which was offered at two landings on the Kentucky side, viz., New York Landing, about three miles above the wharf-boat, and Whitmon's Landing, which is somewhat lower down. After taking on the corn at Whitmon's the tow-boat started to return to her fleet, but while backing out in the river the barge suddenly took water and soon sank, becoming a total wreck, the cargo, including the libellants' goods, sustaining great damage. This occurred late in the evening of Decem-ber 18, 1874. A protest, signed by the officers and some of the crew, was executed December 23, 1874, assigning as the cause of the disaster that the boat struck some unseen obstruc-tion. Immediate notice by telegram of the sinking of the barge with their goods was given the libellants.

" 3. That it has been the general usage in the Pittsburg and New Orleans barge trade, coeval with the commencement of the business, and constantly practised where cargo is to be taken on en route to the port of destination at several points in the same neighborhood, to land and tie up the tow or fleet of barges at the more commodious and safer landing, and detach from the tow the barge or barges designated to receive such cargo, and tow the same to the several points where the cargo may be stored, whether up or down stream, or across the river.

" 4. That at the time of the sinking of the barge Ironsides

No. 3 it was the general and established usage. for barges towed by steam vessels in the Pittsburg and New Orleans trade, having cargo to receive at New York Landing and other points between there and Mt. Vernon, Indiana, to land and tie up the fleet at the latter place and tow back for such cargo the barge upon which it was to be placed, and that the course pursued by the Iron Mountain on the occasion in question was in conformity with such usage of the trade.

" 5. That the usage so practised at Mt. Vernon and elsewhere, as mentioned in the foregoing findings, tends to cheapen the cost of transportation, facilitates business, and conduces to the safety of the whole tow, and is, therefore, a reasonable usage.

" 6. That while the steam tow-boat Iron Mountain, with the barge Ironsides No. 3 in tow, was backing out from Whitmon's Landing, and when out in the river, the barge struck some unmarked, unknown and hidden object below the surface of the water, which caused her to take water and sink, and this, without negligence on the part of the tow-boat, or on the part of the owners of the tow-boat and barge, their agents or servants ; and that it was an unavoidable accident.

" The conclusion of law from the foregoing facts found is, that the respondents were not liable to the libellants for the loss, damage and injury complained of in the libel, and that the libel should be dismissed."

After the decree of the Circuit Court was made, George W. Smith died, and Hostetter, as surviving partner of the firm, appealed to this court from the decree of the Circuit Court. Since the appeal was taken Hostetter has died, and his administrator has been substituted as a party, and Gray has died, and his executors have been substituted as parties.

*Mr. A. H. Clarke* for appellant.

The questions for discussion are (1) what constitutes a deviation ? and, (2), what is a custom or usage binding upon a shipper from Pittsburg to New Orleans direct ?

I. Deviation is a voluntary departure without necessity from

the regular and actual course of the voyage. It must be a necessity, otherwise the carrier is responsible. *The Delaware,* 14 Wall. ·579. *Phœnix Ins. Co.* v. *Cochran,* 51 Penn. St. 143. An unnecessary deviation would discharge the insurance. *Coles* v. *Marine Ins. Co.,* 3 Wash. C. C. 159. *Davis* v. *Garrett,* 6 Bing. 716. The shortness of the time or distance of the deviation is immaterial. *Maryland Ins. Co.* v. *Leroy,* 7 Cranch, 26. The law applicable to deviation applies equally to and is in full force on all river and lake navigation. *Jolly* v. *Ohio Ins. Co.,* Wright (Ohio), 539. It maiters not how short may be the deviation, nor how harmless, nor, indeed, does it aid that it should be shown the alteration made a safer voyage. *Fernandez* v. *Gt. Western Ins. Co.,* 48 N. Y. 571. In *Brown* v. *Tayleur,* 4 Ad. & El. 241, Coleridge, J., says it makes a difference whether a ship stays at one place to load, or goes on a roving voyage to pick up a cargo. ·So in the case at bar. The carrier, after steaming eight hundred and nineteen miles, commences a roving voyage to pick up a cargo. The rule of law is that a ship must visit such ports in the geographical order of their distance from the port of departure. *Classon* v. *Simmonds,* 6 T. R. 553. *Deblois* v. *Ocean Ins. Co.,* 16·Pick. 303 ; *S. C.* 28 Am. Dec. 245. *Kane* v. *Columbian Ins. Co.,* 2 Johns. 264.

II. What is necessary to constitute a custom binding upon a shipper at Pittsburg? In *The Reeside,* 2· Sumner, 567, and approved in *Hone* v. *Mutual Safety Ins. Co.,* 1 Sandford, 137, Mr. Justice Story said : I own myself no friend to the almost indiscriminate habit of late years of setting up particular usages or customs in almost ·all kinds of business or trade to control, vary or annul the general liabilities of parties under the common law as under the commercial law. It has long appeared to me that there · is no small danger in admitting such loose and inconclusive usages and customs, often unknown to particular parties, and always liable to great misunderstanding and misrepresentation and ·abuse.· See also *Simmons* v. *Law,* 8 Bosworth (N. Y.) 213.

When parties in the same trade or business differ as to the existence of a custom it cannot be regarded. *Collings* v. *Hope,*

3 Wash. C. C. 149. It must be known by those it will affect. *Adams* v. *Otterback,* 15 How. 539; *Dixon* v. *Dunham,* 14 Illinois, 324; *Martin* v. *Del. Ins. Co.,* 2 Wash. C. C. 255; and must be reasonable, *Coleman* v. *Chadwick,* 80 Penn. St. 81; certain and uniform, *Wallace* v. *Morgan,* 23 Indiana, 399; and limited in operation, *Daun* v. *London Brewing Co.,* L. R. 8 Eq. 155. In the case at bar it is entirely optional with the carrier whether he will go back 5, 10 or 50 miles or not; hence invalid for uncertainty. The so-called custom of steaming up and down the river, indiscriminately, with goods shipped to go through *direct* to the terminus of the voyage, must surely be deemed "bad." There is apparently no limit to it. See also *Walsh* v. *Frank,* 19 Arkansas, 270; *Strong* v. *Grand Trunk Railway,* 15 Michigan, 206; *S. C.* 93 Am. Dec. 184; *Barrett* v. *Williamson,* 4 McLean, 589; *The Albatross* v. *Wayne,* 16 Ohio, 513; *Wilson* v. *Bauman,* 80 Illinois, 493.

*Mr. James H. Reed* and *Mr. Philander C. Knox,* for appellees, submitted on their brief.

MR. JUSTICE BLATCHFORD, after stating the case as above reported, delivered the opinion of the court.

The only questions presented to us by the counsel for the libellants for consideration are as to what constitutes a deviation from the voyage, and what a custom or usage binding upon the libellants. No question of fact is open, because we are concluded by the facts found by the Circuit Court. *The Gazelle,* 128 U. S. 474, 484, and cases there cited.

The findings of fact are distinct and specific that "it has been the general usage in the Pittsburg and New Orleans barge trade, coeval with the commencement of the business, and constantly practised where cargo is to be taken on *en route* to the port of destination at several points in the same neighborhood, to land and tie up the tow or fleet of barges at the more commodious and safer landing, and detach from the tow the barge or barges designated to receive such cargo, and tow the same to the several points where the cargo may be stored, whether up or down stream or across the river;" that "at the

time of the sinking of the barge Ironsides No. 3 it was the general and established usage for barges towed by steam vessels in the Pittsburg and New Orleans trade, having cargo to receive at New York Landing and other points between there and Mt. Vernon, Indiana, to land and tie up the fleet at the latter place and tow back for such cargo the barge upon which it was to be placed, and that the course pursued by the Iron Mountain on the occasion in question was in conformity with such usage of the trade;" that "the usage so practised at Mt. Vernon and elsewhere, as mentioned in the foregoing findings, tends to cheapen the cost of transportation, facilitates business and conduces to the safety of the whole tow, and is, therefore, a reasonable usage;" that, "while the steam tow-boat Iron Mountain, with the barge Ironsides No. 3 in tow, was backing out from Whitmon's Landing, and when out in the river, the barge struck some unmarked, unknown and hidden object below the surface of the water, which caused her to take water and sink, and this, without negligence on the part of the tow-boat, or on the part of the owners of the tow-boat and barge, their agents or servants; and that it was an unavoidable accident."

The only question presented is, whether the conclusion of law made by the Circuit Court from the foregoing facts, that the respondents were not liable to the libellants for the loss and damage in question, was justified by those facts. On this point we entirely concur with the Circuit Court. It is true that that court does not find directly as a fact, what is averred in the answer, that the usage in question was well known to the libellants at the time their goods were shipped; but it does not find to the contrary; thus leaving for consideration the question of law, whether the existence of such a usage as is found as a fact, is to be presumed conclusively to have been known to the libellants, so as to have formed part of the contract of carriage created by the bill of lading, and to control its terms, and to have made the accident which caused the loss of the goods of the libellants a danger of navigation and an unavoidable accident, excepted in the bill of lading. It was distinctly found by the Circuit Court to have been "an unavoidable accident."

A deviation is defined to be "a voluntary departure, without necessity or reasonable cause, from the regular and usual course" of a voyage, in reference to the terms of a policy of marine insurance; but it is no deviation, in respect to such a voyage, to touch and stay at a port out of its course, if such departure is within the usage of the trade. *Coffin* v. *Newburyport Marine Ins. Co.*, 9 Mass. 436, 447; *Bentaloe* v. *Pratt*, 1 Wall. Jr. 58; *Bulkley* v. *Protection Ins. Co.*, 2 Paine, 82; *Oliver* v. *Maryland Ins. Co.*, 7 Cranch, 487, 491; *Columbian Ins. Co.* v. *Catlett*, 12 Wheat. 383, 387, 388; *Gracie* v. *Marine Ins. Co.*, 8 Cranch, 75, 83; *Child* v. *Sun Mutual Ins. Co.*, 3 Sandford, 26; *Lockett* v. *Merchants' Ins. Co.*, 10 Rob. (La.) 339; *Vallance* v. *Dewar*, 1 Campb. 503; *Ougier* v. *Jennings*, 1 Campb. 505; *Kingston* v. *Knibbs*, 1 Campb. 508; *Moxon* v. *Atkins*, 3 Campb. 200; *Salvador* v. *Hopkins*, 3 Burrow, 1707. Phillips on Insurance, secs. 980, 997, 1003.

The same doctrine is applicable in the case of a bill of lading, even though the usage be not known to the particular shipper, if it be established as a general usage. Phillips on Insurance, secs. 980, 1003; *Thatcher* v. *McCulloh*, Olcott, 365, 369, 370; *Lowry* v. *Russell*, 8 Pick. 360, 362; *McMasters* v. *Pennsylvania Railroad*, 60 Penn. St. 374; *Pittsburg Ins. Co.* v. *Dravo*, 2 Phil. W. N. C. 194.

It is well settled that parties who contract on a subject matter concerning which known usages prevail, incorporate such usages by implication into their agreements, if nothing is said to the contrary. *Robinson* v. *United States*, 13 Wall. 363, 366.

The contract in the bill of lading, that the goods are to be delivered at New Orleans "without delay," is qualified by the exception of "the dangers of navigation" and "unavoidable accidents;" and if the navigation was in its course according to the usage of the trade, as is found to be the fact, the loss in question occurred through a danger of navigation. *Transportation Co.* v. *Downer*, 11 Wall. 129; *The Favorite*, 2 Bissell, 502; *Williams* v. *Grant*, 1 Connecticut, 487.

The claim made in the amendment to the libel, that the sinking of the barge was caused by negligent loading of the

sacks of corn, is covered by the finding of fact that the sinking took place without negligence on the part of the steam-tug or her owners or their agents or servants, and was an unavoidable accident.

The decree of the Circuit Court is *Affirmed.*