## SPENCER KELLOGG & SONS, Inc., et al. v. BUCKEYE S. S. CO.

### No. 6389.

Circuit Court of Appeals, Sixth Circuit.

March 6, 1934.

Sherwin A. Hill, of Detroit, Mich., and Douglas D. Crystal, of New York City (Warren, Hill & Hamblen, of Detroit, Mich., Single & Hill, of New York City, James M. McSweeney, of Cleveland, Ohio, and Carl V. Essery, of Detroit, Mich., on the brief), for appellants.

Lee C. Hinslea, of Cleveland, Ohio (Holding, Duncan & Leckie and L. D. Houck, all of Cleveland, Ohio, on the brief), for appellee.

Before MOORMAN, HICKENLOOPER, and SIMONS, Circuit Judges.

MOORMAN, Circuit Judge.

The steamer Briton was a bulk freighter operating on the Great Lakes. On November 9, 1929, she took aboard a cargo of flax and wheat at Port Arthur and Fort William,

Ontario, for transportation to Buffalo, N. Y. On November 13th, while on the voyage, she stranded off Point Abino, Canada, near Buffalo. Efforts to release her were unsuccessful, and while awaiting the arrival of lighters from the nearest port, a heavy sea arose, swinging her stern around until her full length was on the strand. Further efforts to release her were ineffectual, and thereafter, owing to the violence of the weather, it was not possible to salvage any of her cargo except about 20,000 bushels of flax. After being severely pounded, she was broken up November 24th, with the result that her remaining cargo was lost. Suits in admiralty were filed in Chicago and New York to recover the value of the cargo amounting to some $200,000. Thereafter the steamship company filed the petition in this proceeding for a limitation of liability. The cargo owners filed claims in the proceeding for the value of the cargo, and upon the hearing the District Court dismissed the claims and entered a decree exonerating the petitioner from liability. From this decree, the cargo owners have appealed.

The Briton was constructed in 1891 for use as a package freighter. She was 296 feet long, 41 feet in beam, 21 feet molded depth, and 2,434 gross tonnage. During the World War she was commandeered by the United States Shipping Board and employed on the ocean. In 1923 she was purchased by the petitioner, and was thenceforth operated until her loss upon the Great Lakes. As originally constructed she had a deck known as a "tween" deck between the top or weather deck and the tank tops, the latter being the floor of the cargo holds. Subsequently, and before the vessel came into the possession of the petitioner, the "tween" deck was removed. At that time, too, or at least prior to petitioner's ownership, she was provided with a new after cabin, which necessitated the raising of her cargo trunk hatch to the top of the cabin, about 8 feet above the weather deck. As in conventional lake type vessels, her machinery was aft. She had three cargo holds and four ballast tanks or double bottoms, underneath the cargo holds. The tanks were divided on the keel line by a water-tight division plate. The bottom of the tanks was the outer shell of the vessel and the top of the tanks, as has been stated, was the floor of the cargo holds. There were three water-tight bulkheads: The collision bulkhead, an after peak bulkhead, and a bulkhead separating the machinery space and the cargo space. The adequacy of this latter bulkhead with reference to the seaworthiness of the vessel was one of the issues in the case.

The petition for limitation alleged that the stranding and loss were occasioned without fault or privity of the petitioner. The answers of the claimants put this averment in issue and affirmatively alleged (1) that the vessel was unseaworthy at the inception of the voyage, and that this unseaworthiness was known or should have been known to the petitioner; (2) that she deviated on her voyage in violation of the contracts of affreightment; (3) that a part of the flax was caused to be stowed in a place which was on deck rather than under deck in further violation of the contracts of affreightment; and (4) that the loss was occasioned solely by the negligence and fault of petitioner in failing to exercise due diligence properly to equip, man, and outfit the vessel. Upon the hearing the proofs were directed to the issues of seaworthiness and to deviation in route and stowage. Unseaworthiness was claimed on three separate grounds: (1) Defective tank top drainage system; (2) defective boiler pan; and (3) defective or inadequate bulkhead separating the cargo from the machinery, it being claimed that it was essential to the seaworthiness of the vessel that she have a watertight bulkhead extending from the top of the after tank to the main or weather deck.

The bills of lading stipulated that the shipments should be subject to all the terms, provisions, and exemptions of the Canadian "Water Carriage of Goods Act" (Revised Statutes of Canada 1927, vol. 4, c. 207). That act exempts the ship owner from liability for loss or damage resulting from faults or errors in navigation or in the management of the ship if the owner has exercised due diligence at the beginning of the voyage to make the ship in all respects seaworthy and have it properly manned, equipped, and supplied. It thus appears that under the contracts of affreightment a showing that the vessel was seaworthy at the beginning of the voyage was a condition precedent to the allowance of the exoneration claimed by the petitioner. And this is true even though the Harter Act, § 3 (46 USCA § 192) is applicable. Cf., Knott v. Botany Mills, 179 U. S. 69, 77, 21 S. Ct. 30, 45 L. Ed. 90. In interpreting that act in May v. Hamburg-Amerikanische, etc., 290 U. S. 333, 54 S. Ct. 162, 78 L. Ed. 348, the Supreme Court held that it was not enough to show that unseaworthiness had no causal relation to the damage or loss, but that an owner seeking the exemptions of the act must

first show compliance with the condition upon which they are made to depend, namely, that at the beginning of the voyage the vessel was in all respects seaworthy.

■ Seaworthiness does not comprehend the best form of construction [Moores v. Louisville Underwriters (C. C.) 14 F. 226, 231], or perfection in condition [Hamilton v. United States (C. C. A.) 268 F. 15, 21; In re Gravel Products Corporation (C. C. A.) 24 F.(2d) 702], but only that the vessel be so staunch and strong as to resist the ordinary actions of the sea during the voyage without damage or loss of cargo [Dupont de Nemours v. Vance, 19 How. 162, 167, 15 L. Ed. 584]. Thus the standard by which it is to be determined is "whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport" (The Silvia, 171 U. S. 462, 464, 19 S. Ct. 7, 8, 43 L. Ed. 241) considering the ordinary perils to be anticipated upon the voyage. This is the test which must be applied to the Briton at the beginning of the voyage, with the burden resting on the petitioner to show compliance therewith. The trial court made complete findings of fact, dealing in its findings with each of the grounds specifically alleged as the basis of the claims. On each it found in favor of the petitioner. We deal with the several claims separately, and first, because of the emphasis placed thereon by the claimants, with that relating to the bulkhead separating the machinery from the cargo.

■ The proofs show that this bulkhead extended from the ship's bottom to a point above what had been the main deck or "tween deck." The claimants introduced witnesses who testified that in order to make the ship seaworthy it was necessary that this bulkhead extend from the tank top to the freeboard or weather deck, and that the rules of the American Bureau of Shipping required such a bulkhead. The witnesses testifying on this point, however, were witnesses who had dealt mainly with ocean shipping, and it appeared from the testimony of other witnesses, including the assistant chief surveyor for the American Bureau of Shipping, N. Y., that there were no rules of the American Bureau of Shipping applicable to the Great Lakes, but that the surveyors of vessels on the Great Lakes were governed by the practices existing thereon based on their experience as surveyors for the Great Lakes department of the bureau. This testimony was corroborated by the bureau's surveyors for the Great Lakes and by the United States Supervising Inspector of Steam Vessels for the Ninth District.

It further appeared that the bulkhead complained of was not changed in structure from the time the petitioner acquired the vessel to the time of the loss; that it had repeatedly passed the inspection of the American Bureau of Shipping and the United States Steamboat Inspection Service. Considering all the evidence on this point, we think it so far preponderates in favor of the reasonable safety and adequacy of the bulkhead as to support the burden for the petitioner and require the finding that in this particular the vessel was seaworthy.

The ship tanks were about 3 feet deep, were water-tight, and were so constructed that water could be pumped into and out of them but would not leak from one to another. In the top of each of these tanks was a sump or well similar in appearance to an inverted hat. This sump was a large iron or steel casting, the frame of which was riveted to the tank top, the interior extending down below the tank top to form a well. The opening was covered by a strainer or screen, and there was provided a suction pipe from the pumps in the engine room which extended through the bulkhead and through the screen into the sump or well to within a few inches of the bottom. At the bottom there was a plug. The reason for these sumps was that in bulk-cargo ships it is sometimes necessary to wash out the cargo holds when there has been a change of cargo, for example, from coal to grain. Further, it is common practice in rough weather, when the ship is without cargo, to put water in the cargo holds for ballast. It is contended by the appellants that the sump in tank top No. 4 beneath the boiler pan had been entirely cut out, and that when the ship stranded the water rose from this tank through the sump hole, thence to the blind hold beneath the boiler room, thence through holes in the boiler pan, and passed through a nonwater-tight door in the bulkhead between the boiler room and engine room into the latter, flooding it and preventing the operation of the ship's engines. We are not concerned with defective equipment in its causal relation to the loss or damage, but merely with the issue as to whether there was defective equipment which rendered the ship unseaworthy. If there was, that is sufficient. May v. Hamburg-Amerikanische, supra. We find no credible evidence supporting the appellant's contention that water passed from tank No. 4 through the sump hole into the blind hold. Contrarily, we are convinced that the sump was in good order, and that there was no defect or lack of seaworthiness in this part of the ship. This view, it seems to us, is

supported by facts which are not only testified to by the petitioner's witnesses, but which appear as a part of the evidence of the witnesses testifying in behalf of the claimants. The ship became fast at her keel under tank No. 1, and it appears by the admission of claimants' main witness that water first appeared in the forward tanks. The petitioner's evidence shows conclusively that in the stranding tank No. 1 was punctured and filled with water, and that not until after the ship had been battered and pounded by the heavy seas did water appear in other tanks or the cargo holds.

Nor in our opinion was there any defect in the boiler pan which affected the ship's seaworthiness. This pan consisted of a steel sheet over which there had been placed a layer of concrete. Some time after the vessel stranded, witnesses for the claimants observed holes in the concrete and perhaps also in the steel sheet, but at that time the vessel was practically broken up from the battering and pounding of the gale. Furthermore, the petitioner's proofs show that while there was a leak in the pan several months before, it had been repaired, and the pan was in good order up to the time of the stranding and pounding of the vessel. We are convinced from a consideration of all the evidence on this point, as was the court below, that so far as the boiler pan was concerned, the vessel was seaworthy at the beginning of the voyage.

It is not claimed that the Briton was out of repair or unseaworthy except in the three particulars to which we have referred. As to each of these the evidence convincingly shows that there was no defect which rendered her unseaworthy. Confirmation of this conclusion is found in the testimony of government inspectors and others who regularly inspected the vessel. It appears that an inspection was made by the United States inspector in the early part of July. Certain items of repairs were ordered by the inspector at that time. These repairs were made, according to the testimony of the inspector, who said, "I saw that they were made." Some of them were made at once and others were made between the latter part of August and October 15th. At the beginning of the voyage the vessel bore a certificate of fitness issued by the United States Steamboat Inspection Service in conformity with the laws of the Steamboat Inspection Service and the rules and regulations of the Board of Supervising Inspectors. She had been repeatedly inspected and certified as seaworthy by the American Bureau of Shipping, which represents the grain classification committee of Cargo Underwriters. During the year ending December 31, 1928, she carried twenty-two cargoes of grain without loss or damage of any kind, with one exception, when there was a leakage from the boiler pan which damaged some grain which had shifted into the blind hold. This leak, as we have stated, was repaired. In 1929, prior to the voyage in question, she had carried fifteen cargoes of grain without damage or loss. Only a few weeks before she was lost she carried a cargo through one of the severest storms that the older sailors had ever experienced on the lakes. The storm was so severe that many vessels were wrecked, and yet she weathered it without any loss or damage to her cargo, except a slight damage which resulted from the ripping off of some of her hatches. This trip was made immediately preceding the voyage here in question. Considering all of the evidence, we cannot escape the conclusion that at the beginning of the voyage the vessel was entirely seaworthy. We also are convinced, as was the trial court, that the stranding of the vessel and the consequent loss of her cargo resulted from an error in navigation for which, under the contracts of affreightment, the petitioner was not responsible.

Nor do we think the petitioner can be deprived of exemption from liability by reason of the fact that the Briton stopped at Lime Island in the channel of the Soo river for a few minutes, not exceeding fifteen, and took on 75 tons of coal. She left Fort William, it is true, with sufficient coal to run to Buffalo and to meet any emergency to be expected. Notwithstanding this, there is room to doubt that the stopping at Lime Island is to be regarded as a deviation at all. As that term is ordinarily understood, it is a departure, without necessity or reasonable cause, from "the regular and usual course" of a voyage. Hostetter v. Park, 137 U. S. 30, 40, 11 S. Ct. 1, 34 L. Ed. 568. Certainly the stopping of the vessel in her course for a few minutes to take on coal was not a substantial deviation, and further, it was in accordance with the general custom and practice of freighters taking this route on the Great Lakes. The evidence shows that it was the custom of practically every down-bound vessel on the Great Lakes to stop in her course to take on fuel at Lime Island or at some other fuel dock which she passed en route. The Briton did not deviate from her line of voyage. She followed the customary route, and in the course thereof took on additional coal according to the custom of down-bound freighters. This custom was well enough known to be deemed

150

an incident of the voyage, and therefore to have been contemplated in the contracts of affreightment. Hostetter v. Park, supra.

 It is further claimed that there was deviation in that a portion of the flax was not stowed under deck, and that this circumstance renders the petitioner liable as an insurer of that portion of the goods. The fact is, a small part of the flax was carried in the lower part of the trunk hatch, and it is argued that the trunk hatch was not a structure built within the frames of the vessel, and, not being so, stowage therein could not be considered under-deck stowage. Plainly, that part of the trunk hatch running from the weather deck down into the cargo hold was a part of the original construction of the ship. Prior to the purchase of the ship by the petitioner, an addition was made to the trunk hatch by extending it from the weather deck to the top of the after cabin. This addition was of steel construction. There was evidence to the effect that a cargo loaded inboard the vessel and covered with tarpaulins is considered under deck. It was proved that the trunk hatch was battened down like all the other hatches, and that the only difference between it and the others was that the opening into it was 8 feet higher than the openings into the others. It appears that many other vessels on the lakes have similar cargo hatches. The structure of this hatch was approved by all inspectors. In view of the structure of the vessel and the battening down of the hatch, we think the stowing of a part of the flax in the hatch cannot be said to be a deviation.

 Claimants complain of certain items of cost allowed by the lower court consisting of appraisers' fees, expenses incurred by the petitioner in the suits brought by claimants in Chicago and New York, and subsistence fees for witnesses in the present case. We think the petitioner should pay the appraisers' fees [The W. A. Sherman (C. C. A.) 167 F. 976; Boston Marine Ins. Co. v. Metropolitan Redwood L. Co. (C. C. A.) 197 F. 703, 714; The Walter A. Luckenbach (C. C. A.) 14 F.(2d) 100, 104], but that the expenses incurred by the petitioner in defending the suits filed by claimants in Chicago and New York were properly taxable in this action against the claimants. Compare In re The Garden City (D. C.) 27 F. 234; Providence & N. Y. S. S. Co. v. Hill Mfg. Co., 109 U. S. 578, 600, 3 S. Ct. 379, 617, 27 L. Ed. 1038; Hartford Accident Co. v. Southern Pacific Co., 273 U. S. 207, 215–216, 47 S. Ct. 357, 71 L. Ed. 612. The allowance of subsistence fees for witnesses was objected to generally, but so far as appears from the record before us the court's attention was not called to its failure to certify the facts in its order (28 USCA § 600c). The cause is remanded for the purpose of permitting this omission to be called to the attention of the court and the error corrected if the court desires to do so; but in other respects the orders and decree of the court are affirmed except the order allowing appraisers' fees as costs against the claimants, which is reversed.

Judge HICKENLOOPER participated in the conference decision of this case, but the opinion was not prepared until after his death.