C.A. ARTICULOS NACIONALES de GOMA GOMAVEN, Plaintiff-Appellant,

v.

M/V ARAGUA, her engines, tackle, apparel, furniture, etc., in rem, et al., Defendants-Appellees.

No. 84–3364.

United States Court of Appeals, Fifth Circuit.

April 8, 1985.

---

Leach & Paysse, Philip A. Fant, New Orleans, La., for plaintiff-appellant.

Chaffe, McCall, Phillips, Toler & Sarpy, Gus Manthey, Jr., Kenneth J. Servay, New Orleans, La., for defendants-appellees.

Before GARZA, POLITZ and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

The facts giving rise to this litigation are gratifyingly simple. The district court's unchallenged findings reflect that six cases of tire parts belonging to C.A. Articulos Nacionales de Goma Gomaven (Gomaven) were loaded aboard the M/V ARAGUA at New Orleans for shipment to La Guaira, Venezuela. A clean "on board" bill of lading was issued. One of the cases disappeared prior to or during discharge of the cargo at La Guaira. The missing box, worth approximately $11,000, has never been located.

Gomaven filed this suit against the ARAGUA and its owner, Compania Anonima Venezolana de Navegacion (CAVN), seeking to recover the value of the missing case. The district court held that CAVN was entitled to the $500 per package limitation of liability granted by section 4(5) of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1304(5). Gomaven contends in this appeal, as it did before the district court, that in the circumstances of this case a "deviation" from the contract of carriage should be presumed, which under the law of this circuit would deprive CAVN of the COGSA limitation. We affirm the judgment of the district court.

COGSA governs the relations between maritime carrier and shipper during "the period from the time when the goods are loaded on to the time they are discharged from the ship." 46 U.S.C. § 1301(e). Thus, under the district court's findings, the loss of cargo in this case is governed by COGSA. Section 4(5) of COGSA provides:

**Amount of liability; valuation of cargo**

(5) Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

46 U.S.C. § 1304(5).

Gomaven did not declare the value of the goods shipped on the ARAGUA, so the COGSA limitation of liability applies unless some reason to the contrary appears.[1] Gomaven finds this reason in the doctrine of deviation.

The doctrine of deviation has been a part of the maritime law since long before the enactment of COGSA in 1936. The term has most frequently been used in a geographical sense, to refer to " 'a voluntary departure, without necessity or reasonable

---

1. Under 46 U.S.C. § 1302, every contract for the carriage of goods is subject to the provisions of section 4 of COGSA, so the limitation of liability in section 4(5) is available to CAVN whether the provision was actually included in the contract or not.

cause, from the regular and usual course' of a voyage...." *Hostetter v. Park*, 137 U.S. 30, 40, 11 S.Ct. 1, 4, 34 L.Ed. 568, 572 (1890).[2] The doctrine stemmed in part from the carrier's duty to exercise his best efforts to make a safe carriage of the goods:

> [When the carrier] receives the goods, it is his duty to take all possible care of them in their passage, make due transport and safe and right delivery of them at the place and time agreed upon; .... After having set sail, he must proceed on the voyage, in the direct, shortest, and usual route, to the port of delivery, without unnecessary deviation, unless there has been an express contract as to the course to be pursued; and where the vessel is destined for several ports and places, the master should proceed to them in the order in which they are usually visited, or that designed by the contract, ....

*The Propeller Niagara v. Cordes*, 62 U.S. (21 How.) 7, 24, 16 L.Ed. 41 (1858).

Much of the legal significance of a deviation stemmed from its effect on marine insurance. A vessel making a geographic deviation was considered to be on an entirely different voyage from the one originally contemplated. Since the underwriter did not undertake to insure the cargo on that different voyage, any insurance contract procured by the shipper was annulled.[3] This left the hapless shipper "with unknown risks against which he has not insured and he cannot recover on the insurance which he obtains."[4] As a result the courts required the deviating carrier, who was responsible for these untoward consequences, to assume the function of the insurer. One aspect of this was that any limitation of liability provisions in the contract of carriage were nullified.[5]

Although geographic deviation was the sort most frequently encountered, by the time of COGSA's enactment the concept of deviation encompassed a number of different acts on the part of a carrier. In *G.W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt, A.G.*, 28 F.2d 249 (3d Cir.1928), the Third Circuit gave a definition of deviation which was later adopted by this court in *Spartus Corp. v. S/S YAFO*, 590 F.2d 1310, 1313 (5th Cir.1979):

> To deviate, lexicographically, means to stray, to wander. As applied in admiralty law, the term "deviation" was originally and generally employed to express the wandering or straying of a vessel from the customary course of the voyage, but in the course of time it has come to mean any variation in the conduct of a ship in the carriage of goods whereby the risk incident to the shipment will be increased, such as carrying the cargo on the deck of the ship contrary to custom and without the consent of the shipper, delay in carrying the goods, failure to deliver the goods at the port named in the bill of lading and carrying them farther to another port, or bringing them back to the port of original shipment and reshipping them. Such conduct has been held to be a departure from the course of agreed transit and to constitute a "deviation" whereby the goods have been subjected to greater risks, and, when lost or damaged in consequence thereof, clauses of exceptions in bills of lading limiting liability cease to apply.

28 F.2d at 251.

■ Since deviation and the principle that an unreasonable deviation annulled the

---

**2.** We note at this point that deviations have frequently been divided into two classes: reasonable deviations, which have no adverse consequences, and unreasonable deviations, from which flow the legal consequences discussed infra. For purposes of this opinion, "deviation" means an unreasonable deviation.

**3.** See *Hearne v. Marine Ins. Co.*, 87 U.S. (20 Wall.) 488, 22 L.Ed. 395 (1874); Gilmore & Black, The Law of Admiralty, § 2–6, at 66 (2d Ed. 1975); Comment, Deviation Under the Gen-

eral Maritime Law, 47 Tul.L.Rev. 157, 158 (1972).

**4.** *The St. Johns N.F.*, 280 Fed. 553, 556–57 (2d Cir.1922), aff'd 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201 (1923).

**5.** See *The St. Johns N.F.*, 280 Fed. at 556–57; *Globe Navigation Co. v. Russ Lumber & Mill Co.*, 167 Fed. 228, 231 (N.D.Cal.1908); Gilmore and Black, supra, § 2–6, at 66.

contract of carriage were established parts of the maritime law prior to COGSA, this circuit has consistently held that an unreasonable deviation, whether geographic or otherwise, still operates to deprive the carrier of any limitation of liability in the contract of carriage, including COGSA's $500 per package limitation.[6]

■ Against that background, the question this appeal presents is whether when cargo is loaded aboard a ship but not delivered at its ultimate destination, and the carrier comes forward with no explanation for its disappearance, a deviation should be presumed and the carrier deprived of the COGSA limitation of liability. Gomaven argues that in such a situation, the carrier should be presumed to have converted the cargo or discharged the cargo at the wrong port.

In support of this argument, Gomaven cites *I.C.C. Metals, Inc. v. Municipal Warehouse Co.*, 50 N.Y.2d 657, 431 N.Y. S.2d 372, 409 N.E.2d 849 (N.Y.Ct.App. 1980). In that case, the New York Court of Appeals held that when property was delivered to a warehouse and the warehouse failed to return the property upon proper demand, a prima facie case of conversion was established and any liability limiting provision in the warehousing contract was rendered ineffectual. 431 N.Y. S.2d at 378–79, 409 N.E.2d at 855–56. Gomaven argues that the policy reasons which informed the decision in *I.C.C. Metals*—essentially that the warehouseman was in exclusive control of the goods, had the best information regarding what happened to the goods, and thus should be required to explain their disappearance[7]—are present in this case and require the adoption of a similar presumption. Once the presumption of discharge at the wrong port or conversion is adopted, Gomaven's argument concludes, a finding of deviation is required unless the carrier comes forward with some explanation for the loss.[8]

**6.** *Searoad Shipping Co. v. E.I. duPont de Nemours & Co.*, 361 F.2d 833 (5th Cir.), cert. denied, 385 U.S. 973, 87 S.Ct. 511, 17 L.Ed.2d 436 (1966); *Spartus Corp. v. S/S YAFO*, 590 F.2d at 1316–17. See also *Siderurgica del Orinoco, C.A. v. M/V NORTH EMPRESS*, 1977 A.M.C. 1140, 1142–43 (E.D.La.1976); *International Drilling Company, N.V. v. M/V DORIEFS*, 291 F.Supp. 479, 486–87 (S.D.Texas 1968). *Contra Atlantic Mutual Insurance Co. v. Poseidon Schiffahrt, G.m.b.H.*, 313 F.2d 872 (7th Cir.), cert. denied, 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 53 (1963). COGSA itself explicitly refers to deviation only in section 4(4), which provides:

### Deviations

(4) Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: Provided, however, That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable.

46 U.S.C. § 1304(4).

**7.** Since bailed property is in the possession of and under the sole control of the warehouse at the time of injury or loss, however, it is the warehouse which is in the best, if not the property. Indeed, such information normally will be exclusively in the possession of the warehouse and will not be readily accessible to the bailor. Because of this, the law properly refuses to allow a warehouse, which has undertaken for a fee to securely store goods belonging to another, to avoid liability by simply pleading ignorance of the fate of the stored merchandise. To allow the warehouse to so easily escape its responsibilities would be to place the bailor in an untenable position and would serve to encourage both dishonesty and carelessness. Clearly, the temptation to convert stored property would be significantly increased could the warehouse then avoid all civil liability by simply denying all knowledge of the circumstances of the loss and placing upon the bailor the well nigh impossible burden of determining and proving what happened to his property while it was hidden from sight in the depths of the defendant's warehouse. Similarly, such a rule would reward those warehouses with the least efficient inventory control procedures, since they would be most able to honestly plead ignorance of the fate of goods entrusted to their care.

431 N.Y.S.2d at 377–78, 409 N.E.2d at 854.

**8.** In fact, Gomaven asks us to hold two things new under the sun: First, that such a presumption exists, and second, that conversion by the carrier constitutes a deviation. There appears to be no American decision holding that carrier conversion is a deviation, although Gomaven refers us to a British case, *Sze Hai Tong Bank v. Rambler Cycle Co.*, (1959) A.C. 576, which reach-

CAVN counters that all the cases which research has brought to light on the subject hold that simple non-delivery does not establish a deviation sufficient to oust the contract of carriage.[9] These cases do not, of course, directly address Gomaven's argument for adoption of its presumption, but we do find persuasive the uniform rejection of the argument that non-delivery is a deviation. Gomaven asserts that all of these cases are distinguishable from the present one, essentially because in each of them the cargo *could* have disappeared either before being loaded on the ship or after discharge, when it had passed from the control of the carrier.[10] Even assuming this assertion to be well-founded, however, it has little bearing on what we perceive to be the critical inquiry: whether the simple unexplained disappearance of cargo has the characteristics traditionally associated with a deviation.

The basis for the doctrine of deviation was that the carrier, by a deliberate action, increased the risk to the cargo beyond that which the shipper anticipated. As the Second Circuit noted in *Iligan Integrated Steel Mills, Inc. v. S/S JOHN WEYERHAEUSER*, 507 F.2d 68, 70 (2nd Cir.1974), cert. denied, 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975), the harsh consequence of an unreasonable deviation—ousting the contract of carriage and any provisions limiting the liability of the carrier—was in large part justified by the harsh effect on the shipper—deprivation of any insurance it may have procured on the cargo. When the case was one of simple non-delivery, the shipper's insurance remained in effect. As the district court stated in *Hellyer v. Nippon Yesen Kaisya*, "the non-delivery of a cargo is an ordinary, even though a material breach of the contract and it may be said to be a risk within the contemplation of the parties against which the shipper normally protects himself by insurance." 130 F.Supp. at 211 (footnote omitted)(citing *Bank of California v. International Mercantile Marine Co.*, 64 F.2d 97, 99 (2nd Cir.1933). Non-delivery is simply not, as a historical matter, in the class of carrier actions which were considered serious enough to constitute a deviation. It

es this result. Since we do not adopt Gomaven's presumption, we do not reach this question.

9. *C.A. Seguridad v. Delta Steamship Lines*, 721 F.2d 322 (11th Cir.1983); *Italia di Navigazione v. M/V HERMES I*, 724 F.2d 21 (2nd Cir.1983); *G.W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt, A.G.*, 28 F.2d 249 (3d Cir.1928); *Hellyer v. Nippon Yesen Kaisya*, 130 F.Supp. 209 (S.D.N.Y.1955); *Shackman v. Cunard White Star*, 31 F.Supp. 948 (S.D.N.Y.1940); *Jones v. The FLYING CLIPPER*, 116 F.Supp. 386 (S.D.N.Y.1953).

10. The Eleventh Circuit's recent decision in *C.A. Seguridad v. Delta Steamship Lines* is particularly close to this case. In *Seguridad* three boxes of machinery were loaded aboard the ship in New York for delivery to La Guaira, Venezuela. The ship took on additional cargo in Baltimore, Philadelphia and Charleston, then sailed for Venezuela. The three boxes of machinery were not delivered in La Guaira and were never located. 721 F.2d at 323–24. The shipper's insurer argued that to establish that the cargo was unloaded at the wrong port all it needed show was that the carrier "received the cargo at the originating port and then failed to discharge it at the destination port." 721 F.2d at 325. The Eleventh Circuit, however, stated "we agree with cases from other jurisdictions holding that mere non-delivery does not prove a deviation." Id.

Gomaven distinguishes *Seguridad* on the basis that in the maritime law, "discharge" and "delivery" are not synonomous—discharge being the release of the cargo from the ship's tackle, while delivery is, essentially, placing the cargo in the custody of the person who is supposed to receive it and pass it on to the consignee. See *Tapco Nigeria, Ltd. v. M/V WESTWIND*, 702 F.2d 1252, 1255–59, (5th Cir.1983). Assuming these definitions are correct, delivery could technically take place well after discharge from the vessel. COGSA, as noted earlier, applies to cargo only from receipt by the carrier to the time of discharge. Gomaven's argument is that the Eleventh Circuit in *Seguridad* specifically stated that it was a non-*delivery* case, while the district court's findings establish that this is a non-*discharge* case. Gomaven concludes that in *Seguridad* the cargo *could* have passed from the control of the carrier and thus from COGSA coverage before it disappeared. In this case, however, the district court expressly found that the cargo was in the carrier's control when it disappeared.

Although it is not critical to our decision, we do not find persuasive Gomaven's contention that *Seguridad* is applicable only to a non-delivery situation. The opinion in *Seguridad* does not make any explicit distinction between discharge and delivery, and in fact appears to have used the two terms interchangeably.

would be inappropriate for us to indirectly elevate it to this status by adoption of a presumption.

This position also appears most reasonable as a matter of business practice. Section 4(5) of COGSA gives the shipper two options: to declare the full value of the cargo, obtaining full coverage from the carrier at the cost of higher rates, or to obtain lower rates by leaving the value undeclared and self-insuring for any value above $500. The shipper obviously has the best knowledge of the value of the cargo, and is in the best position to determine which of the two options would be most efficient from an economic standpoint. In addition, the section 4(5) limitation serves an important function in allowing the carrier to evaluate his potential liability and make proper provision. See *Insurance Co. of North America v. S/S AMERICAN ARGOSY*, 732 F.2d 299, 304 (2d Cir.1984). We are reluctant to tamper with this function without some compelling reason.

Gomaven's assertions that the carrier, as the party in the best position to explain the disappearance of the cargo, should be required to explain it have a degree of equitable appeal. It seems unlikely, however, that any carrier which allows cargo to disappear from its vessels with any regularity will keep a significant share of custom in the shipping trade. In light of the considerations discussed above, it is most appropriate to allow the marketplace to vindicate the policy considerations Gomaven raises.

AFFIRMED.