**ROCKWELL INTERNATIONAL CORP., Plaintiff,**

v.

**M/V INCOTRANS SPIRIT, her Engines, Tackle, Apparel, etc., et al., Defendants.**

**No. H–87–1869.**

United States District Court, S.D. Texas, Houston Division.

Feb. 8, 1989.

R.M. Sharpe, Jr., Sharpe & Kajander, Houston, Tex., for plaintiff.

William C. Bullard, Baker & Botts, Gus A. Schill, Jr., Royston & Rayzor, Francis I. Spagnoletti, Vinson & Elkins, Houston, Tex., for defendants.

### MEMORANDUM AND ORDER

LAKE, District Judge.

Before the Court are the motions of the carrier and stevedore in this cargo damage action for summary judgment to limit their liability to $500 per package under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1304(5) and the "Himalaya Clause" of the bill of lading. The shipper argues that the doctrine of deviation precludes application of the COGSA limitation of liability.

Plaintiff, Rockwell International Corp., shipped a cargo of "sheet fed. offset press," packed in 45 crates from Bremen, West Germany, to Houston, Texas, on the M/V INCOTRANS SPIRIT. Intercontinen-

**13.** Cf. Ezekiel, 18:19; not in accord, Exodus, 20:5.

tal Transport (ICT) B.V. owned the M/V INCOTRANS SPIRIT, and INCOTRANS Gulf Europe Service operated it. Fairway Stevedores unloaded the ship in Houston. Clause 2a of the bill of lading (Exhibit A to Fairway's Motion for Partial Summary Judgment) incorporates COGSA by reference, and Clause 19 imposes a $500 per package or freight unit limitation unless the shipper declares a higher value. Rockwell declared no higher value. Clause 3 of the bill of lading extends the limitation of liability to servants and agents of the carrier.

The allegations against defendants, which are taken as true when considering defendants' summary judgment motions, relate to the method of onboard stowage and unloading. The M/V INCOTRANS SPIRIT is a container ship. Because of their weight and size, the three crates in issue would not fit within a sealed container for shipment. Instead, a special flat rack with a floor and ends, but no sides or top, was used. During loading operations INCOTRANS removed one crate weighing 40,000 lbs. from the flat rack and loaded the flat rack without the heavy crate. The heavy crate was then reloaded onto the flat rack. Rockwell alleges that this method of removing and "restuffing" the heavy crate was used because the fully loaded container would have exceeded the lifting capacity of the loading crane in Bremen. It alleges that INCOTRANS instructed its Houston agents to follow the reverse sequence in unloading; that is, first to unload the 40,-000 lb. crate from the flat rack and then to unload the flat rack with the remaining two crates. There is no allegation that this loading and unloading procedure was part of the bill of lading.

According to Rockwell, Fairway first unloaded a smaller crate weighing only 4,000 lbs. from the flat rack. As a result, when it then attempted to unload the flat rack with the two remaining crates weighing 92,000 lbs. onto a chasis with a maximum capacity of 74,000 lbs., the flat rack swayed and capsized the chasis. Rockwell alleges that the damage to these two crates occurred because defendants unloaded a flat rack that weighed more than the safe car-

go capacity of the cranes and auxiliary equipment and because Fairway abandoned the distressed cargo at the discharge site instead of carrying it to a safe stowage area. Because INCOTRANS used these "hybrid" cargo stowage procedures, which allegedly increased the risk to the cargo, for its own convenience, Rockwell argues that INCOTRANS deviated from the contract of carriage and therefore that neither INCOTRANS nor its agents are entitled to rely on the COGSA limitation of liability.

The doctrine of deviation predated COGSA. It arose as a means of avoiding the effect of deviation clauses in marine insurance claims under which cargo lost its insurance if the carrier unreasonably deviated from the voyage described in the bill of lading. Because of this harsh result, courts held the carrier, whose conduct voided the shipper's cargo insurance, itself became liable as an insurer for damage suffered to the cargo during or after the deviation. *The Willdomino v. Citro Chemical Co. of America,* 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491 (1927). By its name and origin a "deviation" means a departure from the terms of the bill of lading. Originally it was most often used in a geographic sense to refer to "a voluntary departure, without necessity or reasonable cause, from the regular and usual course of a voyage ..." *Hostetter v. Park,* 137 U.S. 30, 40, 11 S.Ct. 1, 4, 34 L.Ed. 568 (1890). Over time the doctrine was broadened to include a limited type of non-geographic deviation, sometimes called "quasi" deviation. *C.A. Articulos Nacionales de Goma-ven v. M/V Aragua,* 756 F.2d 1156, 1158 (5th Cir.1985).

All of the cases cited by the parties and found by the Court in which quasi-deviations were upheld have one common, indispensable element—a violation of the terms of the bill of lading. The vast majority of these cases deal with above-deck stowage and resulting exposure to the elements after the carrier had issued a clean bill of lading obligating it to provide below-deck stowage. Since the basis for deviation is a departure from the bill of lading, courts have long held that mere improper stowage

or handling of cargo does not constitute a deviation. *Sedco, Inc. v. S.S. Strathewe,* 800 F.2d 27, 32 (2d Cir.1986); *Petition of Isbrandtsen Co.,* 201 F.2d 281, 286 (2d Cir.1953); *The Chester Valley,* 110 F.2d 592 (5th Cir.1940).

Mere negligence with regard to the stowage or handling of the cargo never constitutes a deviation. Such cases as deck stowage where the bill of lading imports under deck stowage, are not cases of merely negligent stowage, they are cases of stowage contrary to the contract.

*Id.* at 594.

The controlling issue before the Court is thus whether defendants' alleged conduct was a departure from an agreed method of transportation of the damaged cargo. Although Rockwell alleges that there is no custom that would allow a container carrier to deliberately overload a container, and then reverse this procedure during unloading operations, it does not cite to any provision in the bill of lading requiring a particular method of loading, carriage or unloading.

There is language in the often-cited opinion in *G.W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt–Actien–Gesellschaft,* 28 F.2d 249, 251 (3d Cir.1928), that can be read as permitting a deviation if there is "any variation in the conduct of a ship in the carriage of goods whereby the risk incident to the shipment will be increased." However, all the illustrations listed immediately below this language involve deviations from the requirements of the bill of lading. Also, the quoted language is *dicta* since the Court of Appeals affirmed the trial court's decree limiting the shipper to the applicable limitation. Furthermore, cases such as *M/V Aragua,* 756 F.2d at 1158, and *Spartus Corp. v. S/S YAFO,* 590 F.2d 1310, 1313 (5th Cir.1979), make clear by their holdings that at least in the Fifth Circuit a deviation will be found only if there is a violation of the terms of the bill of lading.

This action involves neither geographic deviation nor any other form of previously recognized quasi-deviation. Rockwell has cited no case, and the Court has found none, extending deviation to the allegedly negligent acts complained of by Rockwell in this case. The cases cited by Rockwell do not support such a result. *Asahi America, Inc. v. M/V ARILD MAERSK,* 602 F.Supp. 25 (S.D.N.Y.1985), involved the reasonableness of a geographic deviation by the carrier's agent from the normal truck delivery route, not mere negligence in unloading. In *Transatlantic Marine Claims Agency, Inc. v. S.S. American Leader,* 1986 AMC 1253, 1257 (S.D.N.Y.1986) [1986 WL 1191], the carrier agreed to deliver cargo to Baltimore under a clean bill of lading. Instead, the carrier unloaded the goods in New York and stored them on a pier alongside the vessel. *Vistar, S.A. v. M/V Sea Land Express,* 792 F.2d 469 (5th Cir.1986), involved the carrier's attempt to avoid liability entirely under 46 U.S.C.App. § 1304(2)(a) for cargo damages caused by its overland subcontract trucker. Because the court concluded that § 1304(2) applied only to "the management of the ship," it rejected the carrier's attempt to escape liability. The present case is distinguishable because defendants rely on § 1304(5), which is not so limited in scope, *see* 792 F.2d 471 n. 4, and because of the Himalaya clause in the present case. In *Allstate Insurance Co. v. International Shipping Corp.,* 703 F.2d 497, 499 (11th Cir.1983), the court expressly declined to address any issue other than the applicability of the one-year statute of limitation.

Rockwell also argues that the registry of the M/V INCOTRANS SPIRIT as a "Container Ship" creates an implied obligation under the bill of lading to ship all goods in sealed containers. The carrier's use of an open flat rack, instead of a completely enclosed container, is urged by Rockwell to be a deviation from that implied obligation. The Court is not persuaded by this argument. The only reference in the bill of lading to the method of stowage is found in Clause 9 "Options of Stowage," which states only that "[t]he carrier *may* store the goods in containers." (Emphasis added.) This language belies any notion that the carrier was obligated to use a container at all, much less a sealed

container. Furthermore, to the extent that the description of the vessel in a registry could create an implied obligation, which the Court views as a very tenuous argument, the registry of the M/V INCO-TRANS SPIRIT defeats Rockwell's argument. The registry lists the vessel as a container ship, not a *sealed* container ship, and Rockwell agrees the flat rack used here was "a specialized type of container ..." (Plaintiff Rockwell International Corp.'s Opposition to Defendants Intercontinental Transport (ITC), B.V., INCO-TRANS Gulf Europe Service and Barbour's Cut Marine Contractors, Inc.'s Motion For Summary Judgment, at 2)

Rockwell's attempt to extend quasi-deviation to the negligent stowage and unloading alleged in this case would result in an unwarranted alteration of the contractual and statutory relationship between carriers and shippers. An alleged failure to observe recognized custom would almost always create an issue of negligent conduct that increased the risk to the cargo since such a failure would provide both a duty and a breach of that duty. If, as Rockwell argues, such a failure also created a deviation, the COGSA limitation of liability would be effectively eliminated since it could be overcome merely by alleging negligence. Such a result would not be supportable by the rationale for the deviation doctrine, which has its basis in contract, not in tort. Absent the breach of a contractual obligation between the shipper and the carrier, the shipper here has merely alleged negligence in stowage and handling, which is not the same as deviation. The Court therefore concludes that the method of loading, stowage, and unloading alleged here was not a deviation from the expressed or implied terms of the bill of lading, and that the COGSA limitation of liability is therefore available to defendants. Rockwell's protection from this result, which it chose not to avail itself of, was to declare a higher value on the cargo and pay a higher charge. *See Petition of Isbranaftsen,* 201 F.2d 281, 285 (2d Cir. 1953).

The motions for summary judgment of Intercontinental Transport (ICT) B.V., IN-COTRANS Gulf Europe Service and Fairway Stevedores are GRANTED, and their liability is limited to $1,000.

## ORDER

The Motion for Summary Judgment of Barbour's Cut Marine Contractors, Inc. is DENIED.